ALICE H. LOGAN v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY and FRANK C. PARADISE, Appellants.

Division One, October 5, 1923.

1. **NEGLIGENCE:** Contributory: Humanitarian Rule. The humanitarian rule allows plaintiff to recover even in case the injured party was guilty of contributory negligence, if defendant saw,

or by the exercise of due care might have seen, the injured party in a position of peril and negligently failed to avoid injuring him.

2. ——: ——: ——: **Automobile: Street Crossing.** Evidence that the engineer and fireman of the railroad train, had they looked, could have seen an automobile approaching the street crossing when it was twenty-five feet from the track and the engine was one hundred feet from the crossing; that the train was moving twenty miles and the automobile five miles an hour; that when the engine was one hundred feet from the crossing, the automobile was ten or twelve feet from the nearest rail and moving towards it; that when the automobile was struck by the pilot-beam it lacked only three feet of completely clearing the track; that the train could have been stopped in one hundred feet, and if an emergency brake had been applied the speed of the train, if not completely stopped, would have been so reduced that the automobile would have crossed in safety; that no bell was rung, no whistle sounded, no brake applied, and neither the engineer nor the fireman saw the automobile; that the driver of the automobile was oblivious of his danger, and drove straight ahead, without looking or listening and without stopping or hesitating, all of which the engineer and fireman could have observed had they looked or carefully watched; and that the hour was noon of Christmas day, the crossing was at the business center of the city and on other days at such hour was used by many persons, authorized a submission of the case to the jury under the humanitarian rule, and their verdict for plaintiff cannot be disturbed on appeal, for from such evidence the jury might reasonably have inferred that the engineer and fireman could have seen the driver's peril, in time, by the exercise of ordinary prudence, to have avoided injuring him.

3. ——: **Humanitarian Rule: Steam Railroad: Use of Public Street: Vigilant Watch.** Under the humanitarian doctrine, it is the duty of a steam railroad company, which lays its tracks lengthwise and at surface in a public street and uses it as its right-of-way, to keep a vigilant lookout ahead of its trains for persons on or near the track and in positions of peril, the same as a street railway. The right of automobiles and pedestrians to use such a street is not inferior to that of the railroad company, and it is bound to use due care to look out for the safety of the others, the same as is required of a street railway.

4. ——: ——: **When Applicable.** Where the evidence tends to show that the train, running on a track laid lengthwise and at surface in a public street, could have been stopped after the peril of an automobile at a public crossing was, or by the exercise

of due diligence could have been, discovered, or sufficiently slowed down to have avoided a collision with it, or that at least an emergency whistle might have been blown and the injury thereby avoided, and that it was not stopped, or its speed reduced, or the whistle sounded, the humanitarian rule applies, notwithstanding the contributory negligence of the injured party in going upon the track.

5. ———: ———: Duty to Look: Applies to Trainmen. The doctrine that where it is one's duty to look and see what he could with due diligence have seen by looking, applies not only to drivers of automobiles and other travelers approaching a railroad crossing, but to the engineer and fireman in charge of an engine approaching said crossing. When it becomes their duty to look out for the safety of travelers at the crossing, they are chargeable with having seen what by due care they could have seen. In the eyes of the law what one knows and what he ought to know are equivalents.

6. ———: ———: Oblivious. There is no substantial difference in meaning in "oblivious to the approach of said locomotive and train of cars while approaching said track" and "oblivious to his impending peril or danger while entering upon or crossing said track," and an instruction using the first phrase is no nearer error than would be one using the second.

Appeal from Hannibal Court of Common Pleas.—*Hon. C. T. Hays,* Judge.

Affirmed.

*H. J. Nelson, George A. Mahan, Dulany Mahan* and *Ezra T. Fuller* for appellants.

(1) The evidence shows that plaintiff's husband drove his automobile on the railroad track right in front of an approaching engine without stopping, looking or listening, so close to the engine that it could not be stopped before the collision after he was discovered on the track or could have been discovered by ordinary care. The humanitarian doctrine does not apply. The plaintiff cannot recover under the law and defendant's demurrer should have been sustained. Hall v. Ry. Co., 240 S. W. 175; Rollinson v. Railroad, 252 Mo. 542; Dyrez

v. Railroad, 238 Mo. 47; Burge v. Railroad, 244 Mo. 96; State ex rel. Iron Mountain Ry. v. Reynolds, 286 Mo. 221; Stotler v. Railroad, 204 Mo. 619; Ellis v. St. Ry. Co., 234 Mo. 673; Keele v. Railroad, 258 Mo. 78. Although defendant's train at the time of the accident was running at a speed exceeding the ordinance, still plaintiff cannot recover because her husband's own negligence was the proximate cause of his injury. Lackey v. United Rys. Co., 288 Mo. 138; Burge v. Railroad, 244 Mo. 103; Laun v. Railroad, 216 Mo. 578; Schmidt v. Railroad, 191 Mo. 229. Defendant's engineer and fireman on the approaching locomotive at the time of the injury were not guilty of negligence. All of the evidence shows they used every effort to stop the train before the collision as soon as possible after the discovery that plaintiff's husband was in the danger zone. Plaintiff's husband caused his own injury. McGee v. Railroad, 214 Mo. 542; Degonia v. Railroad, 224 Mo. 596; Burge v. Railroad, 244 Mo. 101. Persons traveling in automobiles must use the same care in approaching and crossing a railroad track as has always been required of other travelers. State ex rel. Hines v. Bland, 237 S. W. 1018; Freie v. Ry. Co., 241 S. W. 671. (2) Plaintiff's Instruction 1 is erroneous for the following reasons: (a) Because the instruction broadens the issue in only requiring the jury to find that the said John Logan was oblivious to the approach of the locomotive and train while approaching said track and not requiring them to find that he was oblivious to his impending peril or danger, if any, while entering upon or crossing over said track. "A court does not possess the power to change by instruction the issues which the pleadings submit." Black v. Met. St. Ry. Co., 217 Mo. 685. (b) The instruction does not confine the negligence of the defendants to the servants and agents of defendant company in charge of and operating the train, but permits a finding against the defendants if any employees may have been negligent, and further than that permits a finding that defendants

may be liable if defendant company did not employ or
provide servants and employees for the purpose of pre-
venting this accident.    State ex rel. v. Ellison, 270 Mo.
653.    (c)   The instruction directs the jury that ordi-
nary care on the part of the defendants in this case
means that the defendants should keep a vigilant watch
or lookout ahead of said locomotive.

*Rendlen & White* for respondents.

(1)    Whether a given case under the humanitarian
theory is one for a jury depends upon the facts thereof.
When a person out of danger moves from a place of
safety to one of danger from an on-coming train, so
close to it and under such circumstances that his danger
could not be reasonably apprehended by those in charge
of the engine (who see or might see his peril) in time
to have saved him by the exercise of ordinary care, there
can be no recovery, as there is no room for the applica-
tion of the humanitarian rule.    However, the facts and
circumstances and the inferences therefrom must be
"so plain that average fair minded men cannot reason-
ably differ about it.    In which event a recovery may be
denied as a matter of law," but if there is a ground for
fair difference of opinion about it, then the question is for
the jury.    Ellis v. Street Ry. Co., 234 Mo. 672.    A ver-
dict on conflicting evidence will not be disturbed.    Such
a verdict is conclusive on appeal.    A jury may draw
every inference from the evidence which it may rea-
sonably bear, and an appellate court may not disturb
their findings upon a question where the evidence will sup-
port different inferences.    Titus v. Delano, 210 S. W. 44.
A demurrer to the evidence admits every material fact
proven and which might be inferred by the jurors from
any of the testimony to be true, and should never be
sustained unless the evidence when thus considered fails
to make proof of some essential facts.    Young v. Webb
City, 150 Mo. 349; Noeninger v. Vogt, 88 Mo. 592; Fear-

ons v. Railroad, 180 Mo. 220; Knorpp v. Wagoner, 195 Mo. 662; Stauffer v. Railroad, 243 Mo. 316; Weber v. Railroad, 100 Mo. 206; Klockenbrink v. Railroad, 81 Mo. App. 409; Eswin v. Railroad, 96 Mo. 290; Strock v. Mesker, 55 Mo. App. 26. (2) This case is controlled by the humanitarian doctrine. When the negligence of the injured party has put him in peril such distance from an on-coming car or locomotive that those operating it can, by warning, or by arresting the speed, or stopping, when possible and necessary, avoid injury to such person, after such operatives discover the peril or where a duty to look arises, might have discovered the peril, then liability for injury springs. The act of negligence of the injured party in such cases is not deemed by the law so concurrent as to defeat recovery, but the negligence of the defendant is deemed the proximate cause of the injury, hence actionable. Ellis v. Met. St. Ry. Co., 234 Mo. 671; Titus v. Delano, 210 S. W. 414; Ruenzi v. Payne, 208 Mo. App. 127; Goben v. Railroad, 208 Mo. App. 5; Milward v. Wabash Railway Co., 232 S. W. 228; White v. Railroad, 202 Mo. 563; Kinlen v. Railroad, 216 Mo. 145; Dutcher v. Railroad, 241 Mo. 137; Maginnis v. Railroad, 182 Mo. App. 713; Epstein v. Railroad, 197 Mo. 720; Murphy v. Railroad, 228 Mo. 62. (3) It is not necessary for a recovery herein, that the train could have been completely stopped, but is enough if the facts and circumstances in evidence and the inference fairly to be drawn therefrom show that the speed of the train could have been slackened and if slackened the decedent would have passed on into safety. Dutcher v. Wabash Railroad, 241 Mo. 166; Maginnis v. Ry. Co., 182 Mo. App. 713; Ellis v. Metropolitan Ry., 234 Mo. 657. (4) One is in peril or in the danger zone in approaching a railroad track in an automobile or with a team of horses when his vehicle approaches so close, or at such a gait as to show a present intention to cross, but a pedestrian is not in the danger zone, until he takes the last few fatal steps, or, oblivious to his danger does

such things as fairly indicate a present intention to take them. Keele v. Railroad, 258 Mo. 79; Ellis v. Met. St. Ry., 234 Mo. 680; Albert v. United Rys., 232 S. W. 793; Maginnis v. Railroad, 182 Mo. App. 713. (5) It was the admitted duty of the engineer to keep a constant lookout ahead and be vigilantly watchful for anyone coming upon or approaching the tracks as they crossed Maple Avenue. It was a well known and recognized dangerous crossing. The duty to look in this case puts the enginemen in the same position as if they were looking and they are held to see what they might have seen. "What one knows and what he ought to know are regarded in law as equivalent." Ellis v. Railroad, 234 Mo. 673; Dutcher v. Railroad, 241 Mo. 165; Murphy v. Railroad, 228 Mo. 82. (6) The sounding of the alarm whistle was one of the means that the engineer could have used to have averted the collision. Proper warning would have prevented Mr. Logan's entry upon the track or possibly a hasty leaving. It has been held the failure to sound the whistle may make the defendant liable under the humanitarian rule. Klockenbrink v. Railroad, 172 Mo. 690; Moore v. Transit Co., 194 Mo. 11; Reyburn v. Railroad, 187 Mo. 572; Riska v. Railroad, 180 Mo. 184; Mann v. Railroad, 123 Mo. App. 486; Kinlen v. Railroad, 216 Mo. 145; Waddell v. Railroad, 213 Mo. 8; Felver v. Railroad, 216 Mo. 195; Ellis v. Met. St. Ry., 234 Mo. 664.

SMALL, C.—I. Suit to recover damages for death of plaintiff's husband, John Logan, who was run over by a passenger train of defendant railroad company, in charge of defendant Paradise, on December 25, 1920, and who died from the effect of his injuries on December 28, 1920. The accident happened at the crossing of Maple Avenue and Collier Street in the city of Hannibal. The deceased was traveling north on Maple Avenue, and the train was going west over the railway tracks in Collier Street, an east-and-west street, which intersected Maple Avenue, a north-and-south street, at right angles.

The charges of negligence in the petition are; That the automatic alarm bell at said crossing was inefficient and out of repair. That it would ring when no train was approaching, and would not ring or give warning when trains were approaching said crossing. That the train was operated at dangerous and unlawful rate of speed, to-wit, at the rate of about twenty-five miles per hour. That the whistle was not sounded at least eighty rods from said crossing, and the bell on said locomotive was not kept ringing until said locomotive had crossed over said Maple Avenue, and that defendant negligently failed to give any timely warning of the approach of said train. That said train was also run at a rate of speed in excess of six miles per hour, in violation of an ordinance of the city of Hannibal. That the deceased, as he approached and passed over said crossing, was unaware of the approaching train, and oblivious to the impending danger, which the railroad employees in charge of said train knew or could have known in the exercise of ordinary care. That said employees negligently failed to keep a lookout for automobiles moving over said crossing, or if they saw, negligently failed to stop or attempt to stop or check the speed of said train, when they saw, or by the exercise of ordinary care could have seen, the decedent and the automobile in which he was riding in a position of peril, and by the exercise of due care could have stopped or checked said train in time to have avoided striking and fatally injuring deceased. That said injuries were the direct result of the aforesaid negligence of the defendant company, and of defendant company's employees, including defendant Paradise, as engineer of said train. The prayer of the petition was for $10,000 damages and for costs.

The answer was a general denial and contributory negligence on the part of plaintiff's deceased husband, in that he drove immediately in front of a rapidly-moving railroad train, without looking or listening for the approach of trains on said track, when by looking he could

have seen, or by listening he could have heard, the approach of said train in time to have avoided the collision complained of.

The reply was a general denial.

The trial resulted in a verdict and judgment for the plaintiff in the sum of $10,000, from which defendants appealed to this court. The accident happened in broad daylight just after the noon hour on Christmas day, 1920. For many years, the deceased John Logan operated a shoe factory at the southwest corner of Maple Avenue and Collier Street. Collier Street ran west from the Union Station in Hannibal, and the railroad tracks at the time of the injury and for many years before ran from the Union Station in and along Collier Street westward to and beyond Maple Avenue, which was a north-and-south street, about eleven blocks due west from said Union Station. Besides one main line of track, there were three other tracks running across Maple Avenue, a side-track and a spur-track north of the main track, and a spur-track south of the main track. Collier Street was sixty feet wide from property line to property line, and Maple Avenue was fifty feet wide. North of Collier Street Maple Avenue was formally dedicated by plat as a public street, but south of Collier Street, while it does not seem to have been formally dedicated, a space fifty feet wide running south for many years was left open and used as an extension of Maple Avenue. The shoe factory at which deceased was manager was located on the southwest corner of Maple Avenue and Collier Street. His office was on the first floor immediately on the southwest corner of Collier Street and Maple Avenue. The front wall of his office was on the south line of Collier Street, and the east wall was on the west line of Maple Avenue. The entrance to his office was on the Maple Avenue side about nine feet south of the corner. The main part of the shoe factory building extended south several hundred feet on the west side of Maple Avenue, and was back about

ten or twelve feet from the west line of the street. The shoe factory was a one-story building. On the east side of Maple Avenue, opposite the shoe factory, was the Hannibal Rubber Company's building, which was a three-story structure. Its west wall was on the east line of Maple Avenue, and its north wall was about fifteen feet south of the south line of Collier Street. The Garner Wood & Coal Company had a large frame building at the northeast corner, and the Hannibal Car Wheel & Foundry Company had their building at the northwest corner of Collier Street and Maple Avenue. At the time of the accident, there was a box car standing on the spur-track, south of the main track, about fifty feet east of the east line of Maple Avenue. The south line of this box car was about even with the south line of Collier Street. About a block further east across Eleventh Street, there was a coal car standing on this spur-track, and also according to plaintiff's evidence, other cars still further east on said spur-track. The south rail of the main track, on which the train was running, is nineteen or twenty feet from the north wall of the shoe factory, and thirty-five feet from the north wall of the Hannibal Rubber Company's building. The crossing at which the injury occurred was near the central business portion of the city, and was a very busy crossing and much used by vehicles and pedestrians. The city by ordinance required the erection of an automatic electric bell or flagman at this crossing. The crossing was especially much used during the noon hour about the time the train passed, there being a number of factories in the immediate neighborhood employing large numbers of people.

The engineer, Paradise, in charge of the train, testified for defendant: That when he took out this train, there were "usually people walking—a whole track of people from the International Factory coming out, and, of course, I have to be careful."

Plaintiff's evidence tended to show: That on the day of his injury the decedent had his Ford coupe parked on the west side of Maple Avenue, right at the entrance

to his office.  There was no glass opposite the driver's seat in this coupe, but there were windows in the doors and also glass in front.  It was an old coupe, in poor mechanical condition, and could not run over five miles an hour northward over this crossing.  It was impossible to go over the crossing in this coupe "on high," "you have to use the low speed."  The temperature was about twenty-five degrees above zero, and the car was hard to warm up.  The grade approaching the crossing to within two feet of the south rail of the main track from the south for about forty feet was about a ten per cent rise or up-grade.

An ordinance of the city of Hannibal was introduced requiring the placing of an automatic electric bell at this crossing by the defendant railroad company "to give due and timely notice to all persons of the approach of trains."  Such a bell had been installed in Collier Street near the southeast corner of Maple Avenue and Collier Street for some time prior to the accident. Numerous witnesses testified for plaintiff that the bell was unreliable; that it would ring continuously for hours, when no train was approaching.  It was heard to ring for several hours after the accident in question.  It had been known to ring nearly all day, whether the trains were approaching or not.  Plaintiff's evidence tended to show that the deceased was acquainted with the defective condition and unreliable character of said automatic bell as a warning of the approach of trains.

The Ford coupe was eleven feet long and seven and one-half feet high.  Plaintiff's evidence as to the distance that the employees of defendant on the engine of the train in question could have seen the deceased approaching the crossing in his automobile was as follows:  That the deceased could have been seen twenty feet south of the main-line track by such employees looking by the northwest corner of the box car standing on the spur-track of the rubber plant, when they were down the track as far as Eleventh Street, about three-hundred feet away; also, when the deceased was twelve feet south of

the track and they were between Tenth and Eleventh Streets, or four hundred or five hundred feet east of the crossing. If the deceased was within two feet of the track he could have been seen by the man in charge of the train when six hundred feet away. Plaintiff's evidence further tended to show that, in addition to the box car standing on the rubber company's spur-track, there were other cars standing further east on the spur-track which obstructed the view from the door of the office of the deceased, in looking east between the said coal car and the north wall of the rubber company's building. The office door at which deceased had parked his car was twenty-eight feet south of the south rail of the main line on the crossing.

On the day of the accident, the train was a light train composed of an engine and four wooden cars due to leave the Hannibal Union Depot at 11:48 A. M. But on this day it started twenty-two minutes late. The day was clear, very light snow, and the track was dry. Witnesses who were in a position to have heard and observed, one of whom saw the collision, testified: That no warning or blasts of the whistle were given by those in charge of the train as it approached the crossing. That the only time the whistle was blown was before reaching Seventh Street, which was 1680 feet or more than eighty rods from Maple Avenue.

The engineer testified for defendants, as to the whistle: "I don't whistle according to regulations. I keep a short whistle to keep them off the track. No one was working this day, and we whistled according to the rules all right, but was not forcing them any. We did not give a succession of short whistles and emergency whistles to Mr. Logan. The warning that Mr. Logan had was the whistle from Seventh to Eighth Street."

As to the speed the train was running at the time of the collision, plaintiff's evidence tended to show it was going fifteen to twenty-five miles an hour. The automobile in which the deceased was riding, according to plaintiff's evidence, was not going over four or five

miles an hour, as it approached the track.  Appellants claim it was going at five miles an hour.  Plaintiff's evidence further tended to show by an eye-witness, Woerman, that the wheels of the automobile had crossed the track, and that "it was the pilot-beam which sticks out on the north side of the engine" which hit the rear end of the automobile which was the only part of the automobile that was injured.  The only mark on the car, besides the right rear wheel, was a square indentation two and one-half to three feet from the rear tip of the car.  The car was thrown northward, and the right front wheel and rear wheels were demolished.  The glass in the right door of the machine was also broken. The rear fender was indented, but the running board and front fender on the right side from defendant's "Exhibit A" do not seem to have been noticeably bent or injured.

Plaintiff's witness, Woerman, testified:  That he was driving south on Maple Avenue just before the accident, and as he approached the north end of the Garner Building, a man coming across the track towards him, motioned to him, that a train was coming, and after he drove a little distance further, the electric gong, at the intersection of Collier and Maple Avenues commenced ringing.  He kept on driving, looked east and saw a train coming, and then stopped his horse when he got a safe distance from the track.  A taxicab man passed by, went around him and crossed the tracks, while he was standing still.  The taxicab man crossed the tracks and went west on Collier Street.  He also saw the deceased Logan, as he got in his car, which was right at or near his office door.  The automobile was headed south, when he got in it.  He turned around and came north to get across the track.  He did not stop at any time.  It was an enclosed car.  "He came straight north towards me.  I was on the north side waiting for the train to go by, and I saw the car, with the man coming up towards the track, and of course, I thought he was going to stop, that was my impression.  Instead of that, he came right

on the track, and crossed right in front of the engine, right in front of the train. I thought he had about got over, the train engine must have hit him some way, at least, there was a crash, and the next thing I seen, I seen the car and Mr. Logan lying on the ground. My impression was he had cleared the track. As far as I know, there was no application of the brakes upon that railroad train and engine. I did not hear any whistle or distress signal or sharp blast or anything of that kind. Mr. Logan was thrown out of the automobile, lying on the ground about ten feet west of the automobile. I knelt down by his side. He was unconcious. I called to him, but he made no signs of hearing. About that time, the taxicab man came back, and I took it on myself to take him to the Levering Hospital." Cross-examination: "I was stopped north of the crossing when I first saw Mr. Logan. He was just getting into his car from his office. The train was then somewhere between two and two and one-half blocks away. I heard no whistle at all. When this man called my attention to the train coming, the gong at the crossing commenced to ring. When Mr. Logan was getting into his car, it was headed south, and he turned, and started up Maple Avenue towards me, and the automobile did not stop or hesitate, but went right on to the tracks. When he went on to the tracks, the train was coming right along from the east to west." Question: "And did he go on the track immediately in front of the coming train?" A. "Yes, it was very close." "The train stopped, when the rear coach was partly on Maple Avenue. My judgment was that the cross-beam or pilot-beam which stuck out on the north side of the engine struck the automobile. He did not look either way. He looked right straight ahead, came right on. He seemed to be unmindful of his surroundings. If I had thought he was coming on the track, I would have jumped out and tried to halt him. He did not stop, came right straight up on the track and I don't think he noticed the train coming at all, the way it looked."

The rules of the defendant company in force at that time required the enginemen to "keep a constant lookout, carefully observe all signals, and see whether other trains are carrying signals."

The rule as to firemen, was as follows: "While engine is moving keep a constant lookout when not engaged in firing. Be on watch if the engineman is obliged to look away from the track in front until he can resume his lookout, give instant notice to the engineman of any signals or indications of danger or obstructions, or if there is any reason to believe the train is parted or has struck any person or object on the track."

There was also evidence for plaintiff that the Ford car used by the deceased could have been stopped within three to five feet going five miles an hour up this incline towards the track.

*Defendant's evidence.* It tended to show that the whistle was sounded within eighty rods of the crossing in question, and the bell was kept ringing. That upon approaching the crossing, as deceased approached it, there was a space and a time, between the box car and the rubber company's building, in which a man could get an unobstructed view of the railroad track to the east. This place was about fifty feet south of the railroad track. About twenty feet south of the south rail you could see down as far as Eleventh Street (about three hundred feet). About nine feet south of the track, there was a clear view to the Union Depot on the north side of the box car, standing on the spur-track of the rubber company. It was also shown that a train traveling fifteen miles an hour would go twenty-two feet per second. At five miles an hour, seven and one-third feet per second. At ten miles an hour, fourteen and seven-tenths feet per second. At twelve miles an hour, seventeen and one-half feet per second. At twenty miles per hour, twenty-nine and three-tenths feet per second. And at twenty-five miles an hour, 36.067 feet per second.

The fireman, W. C. Bottenfield, testified: That he was a freight-engine fireman, was just running the pas-

senger engine there as an extra; not used to the engine. That it was made up at Hannibal, and started from a point four hundred feet west of the Union Depot. That the train was late that day in leaving the Union Station. That when the train was within one hundred feet of the Maple Avenue crossing, he was looking ahead and saw no one in a Ford car approaching the track from the south. After that, he did not look ahead any longer, but glanced back to the steam and water gauge, which it was a part of his duty to do, to see "if we have steam and water to haul the train with. I didn't know of the accident until the engineer, Mr. Paradise, said he hit an automobile and slammed the air on, and I felt the checking of the train. I was watching Maple Avenue crossing, as we approached, until we got in the neighborhood of one hundred feet. There was nothing to keep me from seeing across there, I could see thirty feet south of it, when within one hundred feet of it, and didn't see anything at all. We had a speedometer on that engine to show how fast the train was going; presume the company has it; don't know whether it is here to-day. There was nothing done to arrest the motion of the train until after Mr. Logan was killed. After that, we went not quite a train's length before we stopped. The rear of the train was eight or ten feet beyond the west side of Maple Avenue when it stopped. The engine and tender linked together were about one hundred feet long. Don't know how long the coaches were."

The engineer, defendant Paradise, testified: He was on the right side, and Bottenfield, the fireman, was on the left side, of the cab. The train was two hundred and fifty or two hundred and seventy-five feet long— wooden cars. By applying the emergency brake, that train, if going but six miles an hour, could have been stopped in ten feet, ten to fifteen feet. If going fifteen miles an hour, within seventy-five or one hundred feet. At twenty miles an hour, about two hundred feet. At twenty-five miles an hour, within two hundred and twen-

ty-five or two hundred and fifty feet, something like that. (Two other witnesses for defendants testified to the same effect as to the time in which the train could be stopped). I was sitting on the right side of the engine, looking out the front window, watching the crossing, and between the crossing, right ahead on the track all of the time at my place of duty, doing nothing else, head out of the engine all of the time. I could see the whole track fifty to seventy-five feet ahead of me from where I was sitting. Could see the north rail thirty feet ahead of me. I was watching the Maple Avenue Crossing, as I approached it going fifteen to twenty miles an hour. Tried to hold it to fifteen. I could have seen an automobile on the north rail of the track about thirty feet. I saw nothing that day on the track. Just as we hit the crossing, we struck the automobile. I saw the front wheel of the car, and the minute I saw it, I acted, and set the air. That is all I could do. The instant I saw the automobile the engine hit it. Not much of the automobile passed over the front rail. The draw-bar on the pilot of the engine, struck the automobile. I did not see the automobile on the track, until just as it was hit by the engine. I didn't apply the brakes, or do anything, to arrest the speed of the train until Mr. Logan had been hit. I knew it was my duty, when passing through the city, to keep a constant and vigilant lookout for any one coming on the crossing, and that was what I was doing. That was the main thing that I was to do all of the time. I judge that I could see the north rail within thirty feet of the engine. If the automobile stuck up in the air seven feet, I could see it a closer distance. The motion of the train is retarded very nearly from the instant that you throw on the brakes. I could see this crossing all the time I was approaching from way down at the Star Shoe Factory, and sounded my whistle down at Seventh Street, and sounded it to Eighth Street. But did not sound it again. We did not give a succession of short whistles, an emergency whistle to

Mr. Logan. The warning that Mr. Logan had was the whistle from Seventh to Eighth Street and the bell ringing on the engine. The bell was in good shape and was ringing after we stopped. After I saw Mr. Logan's car on the track, I began to stop the engine and did my best, but before I could move at all the contact came with the car, and it was an instant after I saw Mr. Logan's car on the track.

At the close of the plaintiff's testimony and the close of all the evidence, the defendants requested the court to instruct the jury that the plaintiff could not recover, which the court refused to do.

On behalf of the plaintiff, the court instructed the jury as follows:

"1. The court instructs the jury that if you find and believe from the evidence that on the 25th day of December, 1920, John Logan was driving a Ford automobile northwardly in or on Maple Avenue, a public street, if it was a public street, in the city of Hannibal, Missouri, toward and across a railroad track that crosses said Maple Avenue at right angles, and that defendants, the Chicago, Burlington and Quincy Railroad Company and Frank C. Paradise, then and there operated a steam locomotive and train of cars westwardly on said railroad track toward and upon and across said Maple Avenue at a speed greater than six miles per hour, if you so find, and that said John Logan and the automobile in which he was riding was then and there in danger of being struck and injured by said locomotive, and that the said John Logan while approaching said track was oblivious to the approach of said locomotive and train of cars, if such be the fact, and that said defendants, by using ordinary care in keeping a vigilant watch or lookout ahead of said locomotive for persons or automobiles, if any, in or upon said Maple Avenue moving toward said track could have discovered that the said John Logan and the automobile in which he was riding was then and there in a perilous position, if it was, and in danger of being struck and injured by said locomotive,

in time to prevent said locomotive from striking and injuring said John Logan and the automobile in which he was riding, if any, by reducing the speed of said locomotive in the shortest time they could have done so by the exercise of ordinary care with the appliances then at hand, consistent with the safety of the passengers then and there on said locomotive and train of cars and then failed to reduce the speed of said locomotive in the shortest time they could by the exercise of ordinary care with the appliances then at hand consistent with the safety of the persons then and there upon said locomotive and train of cars, and thereby negligently, directly and proximately caused and permitted (if such is the fact) said locomotive to strike and injure said John Logan and the automobile, if any, in which he was riding, in said street, if it was a street, and that by reason thereof said John Logan died on the 28th day of December, 1920, in the city of Hannibal, Marion County, Missouri, and that when said John Logan was injured as aforesaid, if you find he was injured, and when he died, if you find he did die, he was the lawful husband of the plaintiff and had no minor child or children, natural born or adopted, then you will find in favor of the plaintiff and against both of the defendants, whether you find John Logan was guilty of contributory negligence or not."

The defendant asked no instructions, except the peremptory instructions aforesaid.

II.  The plaintiff invoked below and invokes here the humanity doctrine, which allows a plaintiff to recover even in case the injured party was guilty of contributory negligence, if defendants saw or by the exercise of due care might have seen the injured party in a position of peril and negligently failed to avoid injuring him.

**Humanitarian Rule.**

In the leading case of Ellis v. Met. St. Ry. Co., 234 Mo. l. c. 671 et seq., the humanity doctrine and its limitations are thus stated by this court, per LAMM, J. :

"The case was put to the jury by plaintiffs in their instructions alone on the humanity rule. That rule is a doctrine of the law, which, in one of its phases, casts liability upon a negligent street railway company whenever its servants, operating its car on a public street, see, or by the exercise of ordinary care could see, a street traveler in danger from the going car, and thereafter fail to exercise ordinary care in the use of means at hand to avoid injuring him, when such ordinary care, having regard to the safety of passengers, could have saved the traveler. While negligence always has misfortune for a companion, yet such traveler does not alone bear the burden in the law of that misfortune when he inadvertently goes into a place of danger from a street car so far ahead of it that those who control it may, under the circumstances and conditions given in the rule, save his limb or life. The joint right in the carrier under its easement and franchise, and in the traveler under the easement in the public, to use a public street, coupled with correlative and present duties of all those who use the street to each other, result in the above sensible and settled working theory for the administration of justice between the street traveler and the carrier.
. . .

"The rule stated, of course, has its necessary complement, viz: When a person, out of danger, negligently moves from his place of safety to one of danger from an on-coming street car, so close to it and under such circumstances that his danger could not be reasonably apprehended by those in charge of the car (who see or might see his peril) in time to have saved him by the exercise of ordinary care, then the negligence of the traveler is either the proximate cause of his own injury, or, in case the element of defendant's negligence be also present, then the negligence of the street traveler and the negligence of the carrier are coincident and concurrent—they (excluding the idea of comparative negligence) may be said to balance or offset each other. In

either of which hypotheses there is no room at all for the application of the humanity rule. If a given case in that regard is so plain that average fair-minded men cannot reasonably differ about it, a recovery may be denied as a matter of law. That result has been reached in many cases cited. But if there is a ground for fair difference of opinion about it, then the question is for the jury. We think that at bottom much of the apparent discord between the cases cited for defendant and those cited for plaintiffs disappears when the facts in each adjudged case are rigidly subjected to the foregoing test.''

And on pages 680-81, the court observed:

''The jury were told that if they found the boy was approaching the track unconscious of the approach of the car and found it would be apparent to a prudent motorman that he was unmindful of his danger and was going upon the tracks, then it was the duty of the motorman to take precaution and avoid the collision. We have heretofore pointed out facts supporting that instruction. The crossing was rough and bespoke attention. His hands were on the lines. He was guiding his horse and keeping it going. His face was turned from the car at all times. If the evidence is to be believed, it was plain he was approaching the track bent on crossing it at a gait and with a demeanor showing unconsciousness of impending danger. Under the facts, a reasonably prudent motorman could see so much as that, if on watch and performing his duty in looking out. That duty did not commence merely when the horse's feet were actually on the south track. It commenced at such time as a prudent motorman could see that he was intent on pursuing his journey across the track, oblivious to danger from the car. Then was when he came within the danger zone, and at and after that time the motorman, whose duty was to see him, was not entitled to supinely await the event to see if the boy would save himself. He was obliged to act on reasonable appearances, put his car

under control (if not already so), slack it, if he could, and stop it if necessary and if it could be done. [Holden v. Railroad, 177 Mo. l. c. 469 et seq.; Bunyan v. Railroad, 127 Mo. l. c. 21; Barry v. Transit Co., 119 Mo. App. 38; Moore v. Transit Co., 194 Mo. l. c. 11 et seq.; Cytron v. Transit Co., 205 Mo. l. c. 720.] If the conduct and actions of a party approaching a street railway track would lead a motorman of ordinary prudence to conclude that such party was going upon the track in front of the car, the right of the motorman to act on the presumption that the person would stop before going on the track ceases. [Eckhart v. St. Louis Transit Co., 190 Mo. l. c. 618; Murray v. Transit Co., 108 Mo. App. l. c. 510; Aldrich v. Railroad, 101 Mo. App. l. c. 89; Deschner v. Railroad, 200 Mo. l. c. 331, arguendo.]''

III. Do the facts in the record take the plaintiff's case to the jury under the humanity doctrine as above announced? We think they do. The fireman testified: That he looked ahead and had a full view of the crossing, and a space of thirty feet south

**Facts Establishing Case Under The Rule.** of it, when the train was one hundred feet east of the crossing. That he then glanced at the water gauge on the boiler and did not look ahead again until after the accident. He says, the train was running fifteen to eighteen miles an hour; the engineer says, between fifteen and twenty; and plaintiff's witnesses, between fifteen to twenty-five miles an hour. From this evidence, the jury might have fairly inferred it was running twenty miles an hour. The plaintiff's testimony, not seriously disputed, shows the automobile was approaching the tracks from the south for a distance of perhaps forty feet at between four and five miles per hour. Assume it was going five miles per hour. So that the train was going four times as fast as the automobile. Therefore, when the train was one hundred feet from the point of collision, the automobile was twenty-five feet south of that point. The

collision was caused by the pilot beam on the engine which extended about two and one-half feet beyond the north rail striking the automobile at a point two to three feet from the rear end, according to plaintiff's evidence. If so, when the fireman looked at and viewed the crossing when one hundred feet away, the front end of the automobile was about ten or twelve feet south of the south rail and the whole of the automobile was within the crossing, and could easily have been seen by him had he looked, or looked carefully, for objects on the crossing—when one hundred feet away, as he said he did.

The engineer testified: He was on the right side of the engine looking ahead all the time. He could see the whole track, including the south rail fifty feet ahead of him, and could see an automobile which was seven feet high, such as that of decedent's, within a shorter distance. It is inferable from this evidence, that he could have seen said automobile while it was on the crossing ten or twelve feet south of and approaching the track and the train was one hundred feet east of the crossing. At least, whether he could have done so or not by the exercise of due care was a question for the jury. Of course, both the fireman and engineer testified, they looked and could not see the decedent on or approaching the crossing, but if the other evidence, as to point of collision and speed at which the train and automobile were going, is true, which was for the jury, they did not look diligently, or they would have seen him in such position of peril. If either the fireman or engineer had seen the automobile approaching the track, while the train was one hundred feet from the crossing or even seventy-five feet or perhaps fifty feet and had then applied the emergency brakes (which the engineer testified, caused the train to check up, as soon as applied), while the train may not have been entirely stopped before reaching the crossing (although the engineer testi-

fied, it could have been completely stopped in seventy-five to one hundred feet if going fifteen miles an hour, the rate of speed, stated by the fireman), it might have been sufficiently slowed down, so that the automobile, which only lacked three feet of clearing the crossing, would have passed over in safety. Or had they seen the deceased and given him the emergency whistle, the injury might have been averted. .

All the evidence tends to show that the decedent was perfectly oblivious to his danger, and drove straight ahead, without looking or listening, and without stopping or hesitating, with no window in his machine opposite the seat—all of which the fireman and engineer could have observed, had they looked and carefully watched him before the collision, while approaching the track. At least, that is a question about which reasonable men might differ, and hence a question for the jury. The evidence tending to show that the engineer and fireman, had they looked, with due diligence, might have seen the deceased approaching the crossing in a perilous position, they had no right to assume he would stop, before a collision took place, but were in duty bound to give him an emergency whistle or apply the emergency brake to slacken or stop the train, or both, if they could have done so by the exercise of due care.

Consequently, plaintiff had a case for the jury, under the humanity doctrine, and defendants' demurrers to the evidence were properly overruled.

IV. But, it may be said that there is a difference between this case and street railway cases, such as Ellis v. Met. St. Ry. Co., supra, in regard to the application of the humanity doctrine and the duty of the engineer and fireman, in charge of the operation of the train, to keep a vigilant lookout ahead, for persons on or near the track, and in positions of danger. We do not think so. In this case, the railroad company ran its tracks and trains lengthwise along Col-

**Vigilant Watch.**

lier Street and used said street as a right-of-way, the same as if it were a street railway. It had no exclusive right to the use of such street. Both Collier Street and Maple Avenue were in general use for travel by the public, as well as by said railroad. The railroad company's use thereof was not superior to the rights of the people of Hannibal to the use of said streets. This rule has been long established in this State. In Kennayde v. Pacific Railroad Co., 45 Mo. l. c. 262, the court, per WAGNER, J., said: "The unfortunate Kennayde had the same right to pursue his course that the defendant had to run the train on its track. The rights of the people of Kansas City to travel on and use their own streets and thoroughfares, are not inferior or subordinate to those of the railroad company. They each have a right to exercise their privileges in a lawful manner, and each are equally bound to use caution, care and diligence to avoid accidents."

The above language was quoted with approval in Felver v. Railroad, 216 Mo. l. c. 213, a street railway case. In such cases the rights of the railroad and the public to the use of the street are reciprocal, and each must use due care to look out for the other, the same as if the streets are used by street railways. From this reciprocal right to the use of the street, it follows that, where a railroad company runs its track and train along a public street, crossing other public streets, in a populous part of a city—as in the case before us—due care on its part in operating its trains requires it to anticipate the presence of persons on this dual right-of-way and to keep a vigilant outlook to avoid injuring them, the same as a street railroad company, although there may be no express statute or ordinance so requiring. [Kinlen v. Railroad, 216 Mo. l. c. 156.] The Vigilant Watch Ordinance of the city of St. Louis is but the announcement of a common law duty in congested urban population. [Deschner v. Railroad, 200 Mo. l. c. 329; Ellis v. Met. St. Ry. Co., 234 Mo. 679.]

V.   Numerous cases are cited by learned counsel for appellants in which it was held by this court that the humanitarian doctrine had no application, because the evidence failed to show that there was sufficient time to stop or check the train after the engineer and fireman saw, or could have seen, by due diligence, the decedent in a position of peril. But such cases do not rule this case, because the evidence here tends to show that the train could have been so stopped, or sufficiently slowed down to avoid the injury, or at least the emergency whistle might have been blown and the injury thus averted. In Rollison v. Railroad, 252 Mo. 525, the train was going sixty miles an hour. In McGee v. Railroad, 214 Mo. 530, and Keele v. Railroad, 258 Mo. 62, it was going forty to fifty miles per hour. In Burge v. Railroad, 244 Mo. 76, the train was going sixty miles an hour. In all those cases, the court held that it appeared from the evidence the train could not have been stopped or slackened in time to have prevented the injuries. Besides, most if not all of them were country crossing cases, where the obligation of the enginemen to lookout so as to prevent injury to others by collision, is not so imperative as in populous districts in the city, as in the case in hand. In Degonia v. Railroad, 224 Mo. 564; State ex rel. v. Reynolds, 286 Mo. 221; Hall v. Railway, 240 S. W. (Mo.) 175, and State ex rel. v. Bland, 237 S. W. (Mo.) 1018, the humanity rule was not involved. In Dyrcz v. Railroad, 238 Mo. 33, the injured party had no right to be on the track at all, and the enginemen were not required to be on the lookout for him. None of the cases cited by learned counsel have all the salient facts or features of this case, which bring it within the law announced in Ellis v. Met. St. Ry. Co., 234 Mo. supra.

VI.   The doctrine that where it is one's duty to look and see he will be held to see what he could have seen by looking with due care, applies not only to per-

*Margin note: Actually Seeing Peril.*

**Duty to Look.** sons approaching a railroad crossing, but to the engineer and fireman in charge of the engine when it is their duty to look out, so as not to injure persons when approaching the crossing. In Dutcher v. Railroad, 241 Mo. l. c. 165, this court said: "Again, speaking of due diligence or care, it is axiomatic that he who has at his disposal the means of knowing, is held to know; that he who shuts his eyes when to open them and look is to see, is held to see; that where there is a duty to use diligence, those facts which diligence will discover are presumed to be known under the law of notice; and that what one knows and what he ought to know is regarded in law as equivalent. These truisms are more often invoked in negligence cases against a plaintiff, but where the boot is on the other foot and defendant is charged with a duty to use due care, as here, they fill a very useful office in determining the scope and discerning the elements of defendant's duty."

VII. As to appellants' objections to plaintiff's instruction numbered 1:

(a)  As we have seen, it was the duty of the enginemen to keep a vigilant watchout ahead for persons on the crossing, and therefore it was not error for said instruction to so state.

(b)  Nor was said instruction erroneous, because it only required the jury to believe the decedent "while approaching said track, was oblivious to the approach **Oblivious.** of said locomotive and train of cars," and did not require him to be "oblivious to his impending peril or danger while entering upon or crossing said track." Both phrases, in our judgment, mean substantially the same thing.

(c)  Nor do we think the instruction referred to other employees, than those in charge of the operation of the train, to-wit, the engineer and fireman, where it said: "And the said defendants by using ordinary care in keeping a vigilant watch ahead of said locomotive for

persons or automobiles, if any, in and upon Maple Avenue," because it was only the engineer and fireman who could keep such a vigilant watch ahead of said locomotive, in the usual meaning of those terms.

Finding no error in the record, we are of opinion that the judgment below should be affirmed. It is so ordered. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion of SMALL, C., is adopted as the opinion of the court. All of the judges concur, except *Graves, P. J.,* not sitting.