PEARL DYER, APPELLANT, v. KANSAS CITY SOUTHERN RAILWAY COMPANY, A CORPORATION, RESPONDENT.*

Springfield Court of Appeals. Opinion filed February 17, 1930.

1002

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, section 2708, p. 764, n. 80; Negligence, 45CJ, section 862, p. 1306, n. 39.

*Norman & Norman* for appellant.

*Cyrus Crane, Hugh S. Martin, W. H. Woodson* and *Ray Bond* for respondent.

SMITH, J.—Plaintiff brought suit against the defendant for injuries received by her in Jasper county in a collision of her automobile with an engine of the Kansas City Southern Railway Company. The trial court sustained a demurrer to the evidence at the close of plaintiff's case and she appealed. This necessitates a careful consideration of the evidence in the most favorable light to the plaintiff, since it is conceded that the only question for consideration here is the sustaining of the demurrer.

The injury occurred January 13, 1928, in the forenoon, at a place where defendant's track crosses 20th street, which street runs east and west in Joplin.

Considering the testimony most favorable to the plaintiff we find the following: William Nichols, Jr., testified that at the time of the accident he was working about 100 yards east of the track and that a short time before the accident he saw a touring car going west over the crossing, the train was then a block and one-half away, and before the accident his attention was called to another car going west over the crossing. The second car got clear of the track about ten feet. As the second car got clear of the track on the west side he could see the top of another car coming from the west, which swung slightly to the right and then back on to the track. The train knocked the car clear of the track and caused it to make a complete turn. The train did not stop immediately. He ran from where he was standing to the collision and the train had not stopped when he got there. He did not hear any signal from the train, either the bell or whistle. He said the westbound car had gotten ten feet on the west side of the track when Mrs. Dyer's car turned onto the track. Her car and the westbound car passed each other about ten feet west of the track. There was no obstructions to keep the train crew from seeing the cars. If bell was ringing he never heard it and never heard the whistle at all. It was quiet out there and nothing to keep him from hearing it.

Mrs. W. A. Cox testified that she was standing south of her house near the track facing the crossing and there were no obstructions between her and the crossing, and that she saw the collision. Mrs. Dyer was driving east. The train was coming from the south going north. Prior to the collision she had seen another car crossing the track going west. At the time she saw train coming 150 feet away and saw Mrs. Dyer's car coming from the west, possibly 150 feet away. From the time she saw train until it crossed crossing it did not blow whistle or ring bell. She said positively the bell was not ringing and the whistle was not blowing. The track is down grade as it comes to the north and the train was just coasting, not working steam, and that there was no perceptible slackening in the speed of the train before it struck.

Mrs. Viola Hall testified that she saw the accident and saw the automobiles and that she saw Mrs. Dyer turning out of the road for the automobiles to pass her and after turning out Mrs. Dyer proceeded on and in getting back in the road she was thrown right in front of the train and she saw the train strike Mrs. Dyer. She says that from the time she first saw the train until the crash that she knew positively the bell did not ring and the whistle did not blow and there was no perceptible slackening in the speed of the train. It was coasting and going at a high rate of speed on a down grade. She saw the two cars meeting Mrs. Dyer and that in passing both of them she had to turn out of the road. They were coming much faster than Mrs. Dyer. She had to turn out to the ditch to pass because they did not give her the road. She was driving at a moderate rate of speed and did not speed up any.

Harry M. Fisher testified that he was a machinist by trade and was watching the movement of the train and that the speed of the train was about twenty-five miles per hour, and that he heard no whistle and that the bell on the engine was not rung until after the train had gone beyond the crossing, about a block, and it then began to ring. He knew positively for he was looking at the train and watched it for a while.

George E. Long testified that he was driving on the road a block or more east of the crossing and saw the train coming. The train was then about a city block away, about 450 feet, and he never heard the bell nor whistle. He remembered that everything was quiet that morning and that the train was making no noise. It was coming down the hill almost noiseless.

Dr. A. Benson Clark testified as to the injury of Mrs. Dyer and the treatment which he gave to her. That he found an abrasion on her head. She had symptoms of concussion. Her pulse was accelerated, highly nervous and complained of severe pain in her head.

Also Agnes Famuliner, a trained nurse, and Mrs. Shoemaker, and Dr. A. R. Snyder all testified as to the injury of Mrs. Dyer, but it

is not necessary to set out their testimony for a determination of the questions involved here.

Jack Dyer, the husband of the plaintiff, testified that 20th street for a block or two on either side of the railroad crossing is a narrow graveled street and that it was awful rough on both sides of the gravel.

The plaintiff testified that she was thirty-six years old and was driving the car and had driven a car several years prior to the accident. She was going to her mother's and had just left home. That she was familiar with the streets and knew where the railroad tracks crossed 20th street. That the street out there was graveled with chat and is narrow and the closer she got to the tracks the narrower the graveled portion got, and that as she was driving along about Wisconsin street she was driving fifteen or twenty miles per hour, and when she got within about 200 feet of the tracks she looked up the tracks both ways and did not see the train coming, but looking east she saw a car coming down the road pretty fast, near the center of the road. He had crossed the track and she did not think the driver saw her. He was coming pretty fast in a Ford and the Ford was jumping around. She noticed the man was near the center of the road, and he had curtains on his car and she was afraid with these side curtains on that the man would not see her and she pulled over further than she should. And then as she pulled back into the road there was another car coming which seemed to be coming faster. After she looked for the train when she had passed a little garage about 200 feet from the crossing she did not look any more in either direction for the train. Her attention was drawn to the first car approaching her with the side curtains on, near the center of the road, which forced her over off the graveled portion to the rough part of the street. She had then slowed down to seven or eight miles per hour and then as she pulled back onto the graveled portion of the road she saw the other car approaching much more rapidly and further over on her side of the road and her attention was attracted to these two cars, and that just as she pulled onto the road after passing the second car the train hit the back of her car, and that she did not hear the train approaching, and could not tell what happened after she was hit as she must have been knocked unconscious. She said that after she got around the first car the second car scared her and she was pulling her car around to the right and did not see the approaching train. It was a pretty day and the windows were open on her car. It seemed like the second car came flying across the track and was in the center of the road and forced her to the right, and the road was slanting at that point, and before she could look again, the train had struck the rear part of her automobile.

B. K. Conrad testified that he was the engineer in charge of the train at the time of the accident. That the engine was what is called a mallett engine, double engine, two-in-one. That he occupied the

right side of the engine and the fireman occupied the left side. That there was an incline about one-quarter of a mile back of this crossing and that after reaching the top of the incline it was not necessary to work steam and that the steam was shut off and they were coasting in. That he did not see the automobile prior to the collision. That the train was equipped with a whistle and bell. That after coming ,to the top of the hill until after the collision at the crossing he did not blow the whistle, but said the bell was ringing. He testified that the boiler projects in front of him, about sixty feet and that it was doubtful if an engineer could see anything on the west side of the tracks for 300 or 400 feet south of the crossing. He did not see either one of these cars. The fireman was sitting on his side of the cab and there was nothing to keep the fireman from seeing the automobiles if he had been looking in that direction and that he did not receive any signal at all from the fireman before he struck the automobile; that there was nothing to obstruct the view of the fireman from the west as the train was coming along there. The fireman had a view of all the road and did not give any signal.

All the testimony was to the effect that there was no obstructions between the approaching train and the automobile after the automobile had passed a little garage something like 200 feet from the crossing. Mrs. Dyer could have seen the approaching train if she had looked in that direction and the fireman could have seen the approaching automobile if he had looked in that direction.

Plaintiff pleaded facts sufficient to bring the case within the humanitarian rule. It was alleged in the petition that this was a public crossing. The evidence shows conclusively that it was a crossing used by the public and since it was a public crossing the defendant had no right to rely upon the presumption that the track was clear. All the evidence shows that the fireman came within view of the place several hundred feet prior to reaching the crossing. If he had been looking he would have seen the automobile approaching the crossing with the apparent purpose of going across the tracks. . Ordinary care required that some sort of warning should be given. [Duton v. K. C. Terminal R. R. Ass'n, 292 S. W. 718, 721.]

The testimony shows that the cowcatcher on the engine struck the rear of the automobile driven by Mrs. Dyer. The car was going about seven miles per hour, which would be about ten feet per second. Some of the testimony shows that the train was going about twenty-five miles per hour which would be about thirty-five feet per second. The evidence clearly shows that since the rear of the automobile was struck that the slightest slackening of the speed of the train would have prevented the accident. The testimony shows that one of the witnesses ran 300 yards after the collision to the place of the accident and when he arrived there the train had not stopped. It was a question for the jury to determine, whether the operators of the train, after the fireman

could have seen the plaintiff in the place of danger, could have slackened the speed of the train, and we think the court erred in not submitting that question to the jury.

Since this was a public crossing and used by drivers of automobiles it was the duty of the operators of the train to be on the lookout for danger, and the testimony is all to the effect that the whistle was not blown. In referring to the statutory requirements of blowing the whistle or ringing the bell the Supreme Court in the case of Anderson v. Davis, 314 Mo. 515, 1. c. 558, 559, 284 S. W. 439, had this to say:

"The above statute became the law in the early history of the State and under ordinary circumstances was deemed adequate to protect the public from danger in using these crossings. We cannot shut our eyes to the fact that new and dangerous conditions have arisen in the extended use of motor vehicles, which now make these crossings, both in the cities and country extremely dangerous, as shown by the appalling death toll recorded in the metropolitan press of our land. We should likewise take judicial notice that, under the improved conditions of our highways, the motor vehicle travel will continue to be *extended* and that the lives of many helpless women and children will be constantly at stake in passing over these highway crossings. Is it therefore unreasonable to require at the hands of the railway, without additional expense, and little trouble, when the exigencies of the occasion require it, that its engineer shall use all the means at hand to warn those about to pass over the crossings of the approach of the train, in order that travelers may stop in a place of safety? . . . In Hinzeman v. Railroad, 199 Mo. 1. c. 65, LAMM, J., in clear and forceful language, speaking for our court in banc, said: 'The whistle was there, in going order, and could be blown instantly. The blowing of a locomotive whistle is the ordinary and usual means of giving a sharp alarm, the steam was there to blow it, and the lever was there to operate it, and the man was there to pull the lever and open the throttle. Is it an unreasonable and unfair requirement, then, as a matter of law, if it be held that the whistle should be used if possible, when life is at stake? We think not. The monotonous stroke of a bell may be one thing; the incisive, ear-splitting scream of a whistle, a signal known to man and beast as performing the office an "alarm signa," is another.' "

It was the duty of the fireman to be on the outlook at such crossings and to give the necessary warnings. [Logan v. C., B. & Q., 300 Mo. 611, 254 S. W. 705; Zumwalt v. C. & A. R. R. Co., 266 S. W. 724.]

Evidently the trial court sustained the demurrer to this evidence on the theory that the plaintiff was guilty of contributory negligence as a matter of law. We are not unmindful of the holdings of our courts that as one knowingly approaches a railroad crossing he must look both ways and in not doing so, is guilty of negligence sufficient to

defeat a recovery. But this rule is not so unyielding that it must be applied under all circumstances. The measure of the precaution to be used depends upon the surrounding circumstances. Each case must be ruled in view of the peculiar circumstances in connection therewith. Before the plaintiff can be convicted of being guilty of contributory negligence, as a matter of law, the evidence must be such as to permit of no other conclusion than that she was negligent, giving the plaintiff the benefit of every reasonable inference that may be drawn from the evidence. [Ruenzi, Administrator, v. Payne, 208 Mo. App. 1. c 124, 231 S. W. 294.] In Weller v. Chicago R. R. Co., 120 Mo. 635, 647, it is said:

"The measure of precaution to be observed by a traveler depends often upon the circumstances and surroundings." In the case of Ruenzi, Administrator, v. Payne, supra, at page 125, we have this language:

"In 20 R. C. L. 112, it is said: 'The acts required to be done with a view to the preservation of safety will depend, necessarily, upon the circumstances of the case, the standard of care being that exercised by ordinarily prudent persons under like circumstances.' On page 115 of the same volume of said work it is said: 'But a person may be so situated as to be disabled without fault on his part to look or listen for perils by which he may be menaced. His attention may *have been distracted to legitimate objects.* It has been said that contributory negligence will not, in all cases, be imputed as a matter of law, to a person who receives an injury from a danger simply from the fact that it might have been seen, because the nature of his duties, *or the surrounding circumstances, may be such as to distract his attention* to other objects. It is only in a plain case that a failure to look or listen can be said to be negligence as a matter of law, the issue in this respect being ordinarily for the jury's determination.' [Italics ours.] In 1 Thompson on Negligence, section 189, it is said that 'contributory negligence will not in all cases be imputed to a person who received an injury from a danger which might have been seen, and avoided if seen, because the nature of his duties, or the surrounding circumstances, may be such as to distract his attention to other objects.' "

From the evidence considered the most favorable to the plaintiff with reference to her passing the rapidly approaching cars and the rough condition of the side of the street, which might distract her attention from the approaching train, we are of the opinion that it was a question for the jury to determine as to whether or not the plaintiff was guilty of contributory negligence.

From what has been said in the foregoing we are of the opinion that the demurrer to the evidence should have been overruled under the circumstances in this case.

The respondent complains that the appellant has not complied with our rules, in properly abstracting the evidence and the respondent files a printed copy of the evidence setting out questions and answers in full, and asks that the appeal be dismissed for failure to narrate the evidence properly and for failure to brief the points under proper heads. The appellant suggests that respondents motion should not be considered because no notice of such motion was given the appellant and that the abstract offered by respondent should not be considered because it wholly failed to comply with the rules in that it did not narrate any part of the evidence.

While we do not intend to waive any of the requirements as set out in our rules, for if they are followed, a great deal of expense and worry is often saved, and a close following of our rules is better for the litigants as well as the court, yet, in this case, where there is only one point at issue, we do not feel that there was a sufficient failure to comply with the rules to warrant a dismissal of the appeal.

For the reasons above stated the judgment is reversed and the cause remanded. *Cox, P. J.,* and *Bailey, J.,* concur.