B. HUGH SMITH, Administrator of Estate of JAMES HALEY, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—9 S. W. (2d) 939.

Division Two, October 6, 1928.

106

*E. T. Miller, Kenrick Burrough* and *Ward & Reeves* for appellant.

*Spradling & Dalton* for respondent.

HENWOOD, C.—This is a suit for statutory damages in the sum of $10,000, filed in the Circuit Court of Cape Girardeau County, by the administrator of the estate of James Haley, deceased, in which the negligence of the defendant railway company is alleged as the cause of Haley's death. The trial resulted in a verdict for the defendant, and the court sustained plaintiff's motion for a new trial on the specified grounds that errors were committed in giving to the jury certain instructions, requested by the defendant. The case is here for review on defendant's appeal from the action of the trial court in granting plaintiff a new trial.

The evidence offered by the plaintiff tends to show that on August 11, 1923, the day of the accident in question, defendant's line of railroad from St. Louis, Missouri, to Memphis, Tennessee, extended through the city of Cape Girardeau in a southerly direction, and that State Highway No. 9, known as Kings Highway, ran parallel to and a short distance west of said line of railroad in the vicinity of the plants of the Hely Stone Company and the Marquette Cement Company, which were located about two miles south of the business section of Cape Girardeau. The stone plant was between the railroad and the highway, and the cement plant was about 250 yards south of the stone plant and on the east side of the railroad. There

was a gravel road extending in an easterly direction across the railroad from the highway to the cement plant. This road had been used by the employees of the cement company and other persons having business there for sixteen or eighteen years. The railroad crossing was planked and maintained by the defendant in the same way as other railroad crossings, and the usual "Railroad Crossing" sign stood at the northwest corner of this crossing. At that time, this road extended only as far as the cement plant, but formerly, for many years, it extended farther east and south, and was used by persons going to and from "College Farm," near the cement company's premises, and also by travelers of a county road, which crossed the railroad "between one hundred and three hundred yards south of this road," when the county road was muddy or under repairs. The defendant had two sidetracks on the west side of its main line track, between its main line track and the highway. One of these sidetracks lead off of the main line at a point north of the stone plant and extended in a southerly direction across the road to the cement plant. Leading off of this sidetrack, and between it and the main line, was a spur sidetrack, about ten or twelve feet from the main line, which did not extend as far south as the road to the cement plant. The distance, from the highway to the sidetrack, at the point where it crossed this road, was estimated at twelve to fifteen feet, and the distance from the sidetrack to the main line, at that point, was estimated at eighteen to twenty feet. And, at that point, the main line was from two to four feet higher than the sidetrack, and the highway was about one foot higher than the sidetrack. North of this point, the elevation of the main line above the sidetrack grew gradually less. On both of the sidetracks were "gondola" or coal cars, loaded with rock, and these cars were eight and a half to ten feet in height, from the rail. The whistling post for the railroad crossing on the road to the cement plant was about 300 yards north of that crossing, and there was another whistling post about 600 yards north of that crossing. Three or four days before the accident, John Lohn, Edward Lohn, Walter Olderman and James Haley, came from LaSalle, Illinois, to the cement plant, where John Lohn was engaged in doing some steel construction work, and the other three men were working for him. These four men lived at the Broadway Hotel in Cape Girardeau, and traveled back and forth, between the hotel and the cement plant, in automobiles, morning, noon and evening. Haley had worked two days, and the other men four days, before the accident. On some of the trips Haley rode in John Lohn's Chevrolet touring car, and on other trips in the car of another man employed by John Lohn. They had become familiar with the railroad crossing near the cement plant, but not with the scheduled time of defendant's regular trains at that point. About

one o'clock on the day above mentioned (August 11, 1923), when John Lohn, Edward Lohn, Olderman and Haley were returning from the hotel to the cement plant in John Lohn's car, the car was struck at the railroad crossing by defendant's regular southbound passenger train, known as No. 801, and Olderman and Haley were killed as a result of the collision. John Lohn was on the left side of the front seat, driving the car, and his brother, Edward Lohn, was on the right side of the front seat. Olderman was on the left side of the back seat, and Haley on the right side.

John Lohn testified that he drove south on the highway at eighteen or twenty miles per hour, and, before turning off of the highway to the cement plant road, he reduced the speed of his car to ten or twelve miles per hour, and looked and listened, but neither saw nor heard any train. As he turned into the cement road, he looked to the north and south, and saw nothing, except the cars on the two sidetracks, north of the road. He could see the sky over the tops of the car, but could not see the main line track. He had no view to the north, along the main line track, until he drove beyond the two strings of cars on the sidetracks, and was within six or eight feet of the main line crossing when he first saw the train. The train was then only seventy-five or one hundred feet away. After he saw the train, he heard "short shrieks" of the whistle, but heard no whistle before that, though he "listened all the way down for a train." When he saw the train he "put on all the brakes" and tried "to get out of the road." The car was stopped, with its front wheels "practically on the first rail of the main line," when hit by the train. "It would take ten or twelve feet to stop the car," when going ten or twelve miles per hour. The main line track ran straight from the stone plant to the crossing, the land was level, and there were no obstructions to his view of the train, except the cars on the two sidetracks. The first car on the sidetrack that crossed the road was about a half car length, or twenty feet, from the road. The cars on the sidetrack next to the main line were "some further north," but he could not give the distance from the road to the first car on that sidetrack. He had no arrangement with Haley or the other men about riding in his car and made no charges therefor. He told them that they took "their own chances" in riding with him. He told Haley this, as well as the others. He meant that Haley could "look out for his own risk," and in case of an accident, he (Lohn) "wouldn't be liable." Haley said nothing to him "about looking out for a train, or to listen for a whistle or anything." He thought Haley was twenty-four or twenty-five years old, and had good eyesight and good hearing. Haley had been working for him six or eight months, and was paid "ninety cents per hour—nine-hour day."

The testimony of Edward Lohn, in most particulars, is substantially the same as that of John Lohn. He said they "were going along the highway about fifteen or twenty miles an hour," and, as they turned off on the cement plant road, his brother "slackened up his car, and looked north and south to see if there was any train coming. We did not see any train. The two sidetracks, just west of the main track, were filled within one car-length from the crossing. It took the view all away. There was no signals whatever given until they were right on us; they give then three short whistles. I did not hear any bell or whistle before that." He further said: "After my brother made that turn he looked for trains. When he was looking north I was looking north at the same time; I saw him looking north. I didn't see the train on account of those cars on the sidetrack." Haley did not warn his brother to look out for a train or to stop. "He [Haley] didn't say a word." The seats in the car were about three feet from the ground, and, when seated in the car, a man's eyes would be about five or six feet from the ground. The engine and cars of the passenger train were not much higher than the cars on the sidetracks. They could not see the train over the cars on the sidetracks, because of the top of the automobile they were riding in. When he saw the train, and when it gave the alarm, it was about one hundred feet away, and the automobile was about six or eight feet from the crossing. The cars on the two sidetracks obstructed his view of the main line, north of the crossing, and he could not see the train until the automobile was within six or eight feet of the crossing.

Other witnesses for the plaintiff said that, in August, 1923, there were 500 to 1000 employees at the cement plant, and all of them crossed the railroad at this crossing, in the morning and evening, and some of them at noon. A great many of them traveled to and from their work in automobiles, and this had been going on for several years before this accident. Five witnesses, who were employed at the stone plant, testified that they saw this train approach the stone plant from the north and run down to the crossing on the cement plant road, and that the bell on the engine was not ringing, and that the engine did not give the regular crossing whistle for that crossing, and that it did not whistle at all, in that vicinity, until it was within a short distance of the crossing, where the danger signal was given immediately before the engine struck the automobile. They said the train was running at the rate of thirty-five or forty miles per hour. One of these witnesses testified that some "gondola" cars will vary from twelve to sixteen feet in height, from the rail, and others are only eight and a half feet high, but he did not know the height of the cars on the sidetracks that day. The same witness said

that Pullman cars are from twenty to twenty-four feet high, and that the cars in this train were from twenty-two to twenty-four feet high. Another one of these witnesses said: "A man walking along there (on the cement plant road) could see a train coming over the top of these cars, but if he is riding in an automobile he couldn't see the train because the cars in the way won't let him—I tried it in an automobile a few days after this accident; you can't sit in a car and see over a bunch of cars, see a train. I was looking over some cars on the sidetrack, I thought they were the same kind of cars."

It was admitted, at the trial, that Haley was over the age of twenty-one years, at the time of his death, and did not leave surviving him any wife or minor child; that he died intestate, leaving, as his heirs at law, his mother, three brothers and two sisters; and that plaintiff was the duly appointed, qualified and acting administrator of his estate.

On the side of the defendant, the engineer on the passenger train testified that, after leaving the switch yards at Cape Girardeau, he gave a crossing signal, two long and two short blasts of the whistle, then a station whistle, one long blast, for Gulf Junction, and then another crossing signal for the crossing on the cement plant road. This crossing signal, he said, was given "down close to Hely's" stone plant, and the automatic bell on the engine was ringing continuously from Cape Girardeau station until the engine struck the automobile. He observed this automobile, for quite a distance, as it was going south, parallel with the railroad track, on the highway, and also observed it, all of the time, from the time it turned off of the highway until it was struck at the crossing. In this connection, he said: "At the time I saw that car my bell was ringing, and I saw this car when it turned off of Kings Highway; I judge when I first noticed it, the car was running thirty miles an hour, and when it got down to this road that turned off they slowed down to about ten or twelve miles an hour and made the turn; they continued to slow down until they got about midway between Kings Highway and the main track of the Frisco, slowed down pretty slow, and at that time I thought it was going to stop when he slowed up there. When it got about half way between Kings Highway and the main track, the track I was on, he kept slowing up and all at once he shot out a little burst of speed and up the grade; I was sure he was going to try to cross ahead and I grabbed the whistle and give it a jerk, figured he could stop quicker than I could; I was about seventy feet away from him when I saw him make that shoot to go over the track. I just grabbed the whistle and gave it a couple of jerks. There was nothing else I could do. I absolutely could not have stopped the train. It would have taken five hundred feet to stop the train at

the speed it was going, and I was within seventy feet of him when I saw he was going to cross." He had been an engineer on this line of railroad for twenty-three years, and passed over this crossing every twenty-four hours, "one way in the daytime and one way at night." The crossing had been there "quite a while," but he "couldn't say" whether it had been all of that time. There were "a lot of employees" at the cement plant, and sometimes he saw persons going across that crossing. The train was running "about thirty-five, thirty-eight or forty miles an hour."

The fireman testified that he was on the left side of the engine, and did not see the automobile until the danger signal was given, when the train had nearly reached the crossing. His testimony was practically the same as the engineer's, as to the speed of the train, the ringing of the bell on the engine, and the whistle signals given by the engineer for this and other crossings and the station whistle for Gulf Junction. He said: "All the signals were given properly as we approached this crossing in question."

The Highway Engineer of Cape Girardeau County testified that the cement plant road had been used by employees and persons having business with the cement company and "everybody that wanted to ever since this cement plant was located there." The crossing had planks and macadam between the rails, and was a "good crossing." When the road overseer for Cape Township was offered as a witness, it was admitted that no public funds were expended and no public work was done on this road, and that it was not opened by an order of the county court.

According to their testimony, defendant's section foreman was about 1000 feet, and its claim agent about 500 feet, north of this crossing at the time of the accident, the former being along the right-of-way, and the latter standing on the rear end of a northbound passenger train, which was on a passing track near the stone plant. The section foreman said he heard the engine of the southbound train give the crossing signal for the crossing north of the stone plant, and for the crossing in question, and the alarm signal given near that crossing, but "wouldn't be positive" whether the bell on the engine was ringing or not. He also said: "I put a plank on each side of the rail and the cement company filled it in," at the crossing. The claim agent said he heard the alarm signal, but no other signals. Both of them went immediately to the scene of the accident and made observations and measurements, and later that afternoon the claim agent had some pictures taken of the crossing and its surroundings. It further appears, from their testimony, that the main line track, at this crossing, was four feet higher than the side-track next to the highway, and the highway one foot higher than this sidetrack; that there were five cars on this sidetrack, and seven cars

on the sidetrack next to the main line; that it was 112 feet from the crossing to the first car on the sidetrack next to the highway, and 230 feet to the first car on the sidetrack next to the main line; and that it was twenty-seven feet from the middle of the sidetrack crossing to the middle of the main line crossing. Both of these witnesses and other witnesses, who were present when these observations were made, testified that a person seated in an automobile, headed east on the cement plant road and from eighteen to twenty-five feet west of the main line crossing, could see a train approaching the crossing from the north for a distance of 600 feet, and that the cars on the sidetracks did not obstruct the view of a person so situated. Three pictures taken on the afternoon of the accident (defendant's exhibits 1, 2 and 3) were offered in evidence. Exhibit 1 shows the main line crossing and also the sidetrack crossing of the cement plant road. As shown by this picture, the road bends somewhat to the southeast from the highway to the sidetrack crossing, on a down-grade. From the sidetrack crossing to the main line crossing, it appears to run straight toward the east on an up-grade. Exhibit 2 shows a Ford touring automobile headed east and standing on the sidetrack crossing, with the rails of the sidetrack between the front and rear wheels of the car. Cars on both sidetracks are shown by this picture, at a considerable distance north of the crossing, leaving a view of the main line track to the north, from the automobile, of several hundred feet, apparently. Exhibit 3 shows the same automobile headed east, but somewhat nearer the main line crossing, the rear wheels of the automobile being about the middle of the sidetrack crossing. The view of the main line to the north, from the automobile, is the same as in Exhibit 2, except that the view of the main line extends a little farther to the north, and an engine headed south on the main line is shown at a point, apparently, several hundred feet north of the crossing. The claim agent further testified that he returned to the scene of the accident a few days later, and had the yardmaster place cars on the two sidetracks in the same position they stood at the time of the accident. And, at his request, two or three citizens of Cape Girardeau accompanied him and observed the approach of the same southbound passenger train, from the cement plant road. These witnesses said that, when seated, in an automobile "on Kings Highway," and "on the west side of the railroad, about fifty feet from the crossing," they could see the train, over the cars on the sidetracks, as far north as the rock crusher and all of the way down to the crossing.

Several other witnesses, located in the vicinity of the stone plant, testified that, on the day of the accident, they heard the engine of the passenger train whistle for the crossing on the cement plant

road. Some of the witnesses said the bell on the engine was ringing as the train passed the stone plant, and others said they did not know whether the bell was ringing or not.

In rebuttal for the plaintiff, John Lohn testified that defendant's pictures, that is, Exhibits 2 and 3, did not correctly represent the position of the cars on the sidetracks at the time of the accident; that these cars were closer to the crossing than they appear to be in the pictures.

The petition alleges the negligence of the defendant in the following particulars:

1. The failure of defendant's employees in charge of the train to give the statutory signals as the train approached the crossing.

2. The dangerous and excessive speed of the train and the failure to give timely warning signals when the train was approaching the crossing.

3. Permitting cars to be and remain on the sidetracks in such position as to obstruct the view of persons approaching the crossing.

4. The failure of defendant to have a flagman or watchman at the crossing to warn travelers of the approach of trains.

5. The failure of defendant's employees in charge of the train to comply with the humanitarian rule.

The answer is a general denial, coupled with a plea of contributory negligence.

Errors in giving to the jury defendant's Instructions E, O, P, Q, S and T, were specified by the court as the grounds upon which plaintiff's motion for a new trial was sustained.

These instructions will be quoted in full, as follows:

"E. Now at the close of plaintiff's case the court instructs the jury that plaintiff cannot recover in this case upon the theory that the defendant's employees in charge of the train in question saw, or by the exercise of ordinary care could have seen, deceased and said automobile on said road approaching said crossing and in a position of imminent peril of being struck by defendant's train, in time thereafter, by the exercise of ordinary care to have sounded the whistle or rung the bell, slackened the speed or to have stopped the train and to have avoided striking said automobile.

"O. The court instructs the jury that notwithstanding you may find and believe that the defendant's employees operating the train in question or the defendant was negligent in one or more of the acts complained of in this case and which are set out in other instructions herein, yet if you further find and believe that either one of the following things occurred plaintiff cannot recover, to-wit:

"1. That the said James Haley was also negligent in failing to keep a lookout for the approaching train and failing to warn the

driver of approaching danger that he did or could have seen by the exercise of ordinary care in time to have prevented the collision; and that such negligence of James Haley, if any, directly contributed to the collision;

"2. Or if you find that the collision was wholly caused by the negligence and carelessness of the driver of the automobile in question, and defendant was not negligent in running and operating the train, then, and in either event, plaintiff cannot recover, and your verdict should be for the defendant.

"P. You are further instructed that the defendant has interposed in this case a defense known as contributory negligence, which, if established to your reasonable satisfaction is a complete defense to this case. Upon such defense of contributory negligence you are instructed that if you find and believe from the evidence in this case that the deceased, James Haley, while riding in the car approaching the crossing in question, did see or hear the approaching train, or if you find and believe that by the exercise of ordinary care he could have seen or heard the approach of said train, then the law required him to advise the driver of such apprehended danger if he could have done so in time to have prevented the collision. Or if you find and believe that there were certain cars on the sidetrack that prevented James Haley from seeing the approach of said train, then the law would require him, if he saw or could, with the exercise of ordinary care, have seen that the driver was taking no heed thereto, to advise and warn the driver of the danger under such circumstances of attempting to pass over the crossing in question. Now if you find and believe that said James Haley negligently acted in regard to the above enumerated details and that such negligence, if any, directly contributed to the injury, then plaintiff cannot recover in this case and the verdict ought to be for the defendant. And this is true notwithstanding you may find and believe the defendant or its employees were negligent as set out in the instructions.

"Q. You are further instructed that notwithstanding James Haley was not the driver of the automobile and was merely a guest or a passenger therein, yet the law placed upon him certain duties to look out for his own safety, and in this connection you are instructed that the railroad crossing in question was of itself a sign and warning of danger, and the law required not only the driver of said automobile, but also James Haley, to use ordinary care in looking out for the approach of trains at said crossing, and the law also required James Haley to keep such lookout so that he could warn the driver of the car of any such danger if same could be, by use of ordinary care, discovered by James Haley in time to have prevented the accident.

"And the law further required said Haley if he saw that the driver of the car was not approaching the crossing in a careful manner, and was oblivious to approaching danger, to warn him thereof. And if you find and believe that said James Haley was negligent in above duties and that such negligence, if any, directly contributed to the cause of injury in question then plaintiff cannot recover in this case; and that is true notwithstanding you may further find and believe that the defendant's employees operating said train were negligent in failing to ring the bell or blow the whistle or in operating the train at an excessive rate of speed.

"S. You are instructed that notwithstanding you find and believe from the evidence in this case, that the operators of the defendant's passenger train in question neither sounded the whistle nor rang the bell as set out in other instructions; yet you are also instructed that notwithstanding such failure, the deceased, James Haley, was required by law to use ordinary care to look out for and listen for an approaching train before attempting to go over the crossing in question; and he must do this a sufficient time and distance before reaching the crossing to give him time to warn the driver of the automobile of any approaching train (provided, he could by such care have seen or heard such approaching train); and you are instructed that if said James Haley failed in said duty and such failure, if any, contributed to the cause of the collision, then plaintiff cannot recover in this case and your verdict should be for the defendant.

"T. The court instructs the jury that if you find that the operator of the defendant's passenger train in question sounded the whistle eighty rods from the road crossing in question and at intervals thereafter to the said road crossing; then plaintiff cannot recover in this case; or, if you find that the operators of defendant's said passenger train, rang the bell eighty rods from said road crossing and kept same ringing until the collision with the automobile in question, then plaintiff cannot recover in this case and your verdict must be for the defendant."

I. The first question for our consideration is whether or not the evidence as a whole made a case for the jury under the humanitarian doctrine. After a very careful review of the evidence, it is our conclusion that error was committed in giving defendant's Instruction E, by which this question was withdrawn from the consideration of the jury, and that the trial court was right in so ruling, upon plaintiff's motion for a new trial.

Plaintiff's evidence tends to show that the driver of the automobile, in which Haley was riding, reduced its speed from eighteen or twenty miles per hour to ten or twelve miles per hour as he turned off of the highway and approached the crossing, and that he looked in both directions, north and south, and listened, and neither saw nor heard the approaching train until he was about six or eight feet from the crossing, too late to stop the automobile before reaching the crossing. The evidence presents a sharp conflict as to the ability of the driver to see the main line track, north of the crossing, and the train coming from the north, until after they passed the two strings of cars on the two sidetracks, north of the crossing and west of the main line track, but there was substantial proof tending to show that their view of the train was so obstructed. Although it appears that the main line track was somewhat higher than the sidetracks, for a considerable distance north of the crossing, and that the engine and cars of the train were higher, from the rail, than the "gondola" or coal cars on the sidetracks, there was positive testimony to the effect, that, because of the close proximity of the cars on the sidetracks to the crossing and the road between the highway and the crossing, and because of the top on the automobile, the occupants of the automobile could not see the train on the main line track, by looking over the cars on the sidetracks. The evidence further tends to show that, after seeing the train, the driver of the automobile, though making an effort in keeping with the emergency, was unable to stop the automobile until its front wheels were "practically on the first rail of the main line," and he testified that "it would take ten or twelve feet to stop the car," when going at the rate of ten or twelve miles per hour. Both the driver of the automobile (John Lohn) and his brother (Edward Lohn) testified that the danger signal, short blasts of the whistle, was given after they passed the cars on sidetracks and after they saw the train, then not more than seventy-five or one hundred feet away, and that they did not hear the engine whistle nor any other warning of the train's approach before that. Other witnesses for the plaintiff testified to substantially the same effect. Moreover, they are supported by testimony of the engineer as to when the danger signal was given. It further appears from the testimony of the engineer, that he saw the automobile while it was moving southward on the highway and continued to see it, all of the time, after it turned off of the highway and approached the crossing, until the collision occurred. In this connection, the engineer said, in substance, that the speed of the automobile was reduced to ten or twelve miles per hour as it turned off of the highway and continued to "slow down" until it was "about midway" between the highway and main line crossing, where he thought it was going

to stop; but, instead, its speed was then increased and it started on the up-grade toward the crossing, and it was not until then that he gave the danger signal. It is perfectly clear, from the evidence, that neither the train, running at the rate of thirty-five or forty-five miles per hour, nor the automobile, running at the rate of ten or twelve miles per hour, could be stopped in time to prevent the collision. And, inasmuch as the automobile stopped when its front wheels were on the "first rail" of the track at the crossing, any possible reduction in the speed of the train would have been of no avail, in an effort to prevent the collision. But, the driver of the automobile said he could stop it within ten or twelve feet, at the rate of speed it was approaching the crossing (ten or twelve miles per hour), and, according to his testimony, he did that well or better, after he first saw the train, or knew of its approach, then being only six or eight feet from the crossing. And the engineer said he saw the automobile continuously from the time it turned off of the highway until his engine struck it at the crossing. Following the well-established rule of giving plaintiff the benefit of the most favorable view of the evidence as a whole, we must conclude that an earlier sounding of the whistle, the danger signal, by the engineer, might have warned the driver of the automobile of the approaching train, when the automobile was at a sufficient distance from the crossing to have enabled him to have stopped it at a point of safety, and might have thereby prevented the collision. True, the engineer said he thought the automobile was going to stop at a point of safety, but, under the humanitarian rule, as applied in this State, it was for the jury to say whether or not the exercise of ordinary care and prudence, in view of all of the attending circumstances, required that he sound the alarm, or give the danger signal, when he saw the automobile turn off of the highway and start toward the crossing. Under proper instructions on this phase of the case, the jury might have concluded that the engineer failed to comply with the humanitarian rule, in not giving the danger signal in time to afford the driver of the automobile a fair chance to stop it free of danger, instead of assuming that it was going to stop in safety, until it was too late for such danger signal to accomplish that purpose. In this conclusion, we are amply supported by previous rulings of this court. Among the most recent cases, similar in facts and in principle, are Anderson v. Davis, 314 Mo. 515, 284 S. W. 439; Zumwalt v. Railroad, 266 S. W. 717; Logan v. Railroad, 254 S. W. 705. [See, also, Chapman v. Railroad, 269 S. W. (Mo. App.) 688.] In support of their contention to the contrary, counsel for appellant cite in their brief and rely upon the majority opinion of the Springfield Court of Appeals in the case of Anderson v. Davis, 251 S. W. 86. Obviously, counsel overlooked the fact that this court ruled against such majority opinion and fol-

lowed the rule announced in the dissenting opinion of that court, as to the application of the humanitarian doctrine in a situation like the one presented in this case. See opinion of this court in Anderson v. Davis, supra.

II. Defendant's Instruction O was manifestly erroneous, in part "2" thereof, in directing the jury to return a verdict for the defendant, if they found "that the collision was wholly caused by the negligence and carelessness of the driver of the automobile in question, and defendant was not negligent in running and operating the train." Thus, the jury was expressly authorized by the court to impute to Haley the negligence of the driver of the automobile, if any they found, and thus, the jury was further advised that, if the negligence of the driver was the sole cause of the collision, plaintiff was not entitled to recover in this action. It is now well settled in this State that the negligence of the driver of an automobile cannot be imputed to another occupant of the automobile, unless the relation between them was such that the driver's acts or omissions were under the law the acts or omissions of such other occupant of the automobile, or unless such other occupant of the automobile expressly sanctioned what the driver did or failed to do. [Boland v. Railroad, 284 S. W. (Mo. Sup.) 141; Treadway v. United Rys. Co., 253 S. W. (Mo. Sup.) 1037; Simpson v. Wells, 237 S. W. (Mo. Sup.) 520; Durbin v. Railroad, 275 S. W. (Mo. App.) 358; Chapman v. Railroad, 269 S. W. (Mo. App.) 688; Shutz v. Wells, 264 S. W. (Mo. App.) 479; Vogt v. United Rys. Co., 251 S. W. (Mo. App.) 416.] The automobile belonged to the driver, John Lohn; he was in the physical control and management of it; he was not the agent or servant of Haley; they were not engaged in a joint enterprise; Haley was merely Lohn's guest. It is clear, therefore, that no act of Lohn's was attributable to Haley as a matter of law. Nor did Haley expressly sanction anything done by Lohn in the handling or management of the automobile. He left the control and management of the automobile entirely to Lohn, the driver. Edward Lohn, the driver's brother, testified: "He [Haley] didn't say a word."

This instruction was also erroneous, in part "1" thereof, in telling the jury, in effect, that it was Haley's duty as a matter of law "to keep a lookout for the approaching train and to warn the driver of approaching danger," and that, if, by the exercise of ordinary care, he could have discharged this duty in time to have prevented the collision and failed to do so, he was guilty of such contributory negligence as to defeat plaintiff's recovery, even though the jury

found that defendant was negligent in any one or more of the acts complained of in this case. While the law requires a guest in an automobile to exercise ordinary care and prudence for his own safety, and does not permit him to intrust his safety absolutely to the driver, regardless of impending danger or apparent lack of ordinary caution on the part of the driver, it does not require him to use the same vigilance as is required of the driver, nor put him under the same obligation to look for danger as is the driver. [Boland v. Railroad, supra; Durbin v. Railroad, supra; Chapman v. Railroad, supra.] In the Boland case (l. c. 144), RAGLAND, P. J., said: "It is a matter of common knowledge that under ordinary circumstances such occupants do largely rely upon the driver, who has the exclusive control and management of the vehicle, exercising the required degree of care, and for that reason courts are not justified in adopting a hard-and-fast rule that they are guilty of negligence in doing so. Every case must depend upon its own particular facts." (See authorities cited in that case.) This and other instructions touching this question should have left it to the jury to determine what the exercise of ordinary care and prudence demanded of Haley under all of the surrounding circumstances, at the time and immediately before the collision. Such was the ruling of this court in condemning a similar instruction in the Boland case, l. c. 144. The testimony of the driver and owner of the automobile that he told Haley that he (Haley) could ride in the automobile and "take his own chances" and that he (the driver and owner of the automobile) meant thereby to relieve himself of liability to Haley for accidents, was a matter for the consideration of the jury, in determining the question of ordinary care on Haley's part, but such arrangement, if made, did not, as contended by appellant, enlarge Haley's duty as a matter of law, and accordingly authorize the instruction to the jury that it was Haley's duty as a matter of law "to keep a lookout for the approaching train and to warn the driver of approaching danger," regardless of the driver's own actions in the premises, and regardless of the care and caution exercised by the driver at the time of the impending danger.

It will suffice to say that defendant's Instructions P, Q and S, or, at least, parts of such instructions, are subject to the same criticism as defendant's Instruction O, and are, therefore, erroneous, in advising the jury that the law required Haley to look out for approaching trains at the crossing, or to warn the driver of apprehended danger, without reference to the care and caution the driver may have been exercising, at the time, to look out for approaching trains and to avoid the danger of being struck by a train at the crossing. As we have already said in the

discussion of Instruction O, Haley was not charged with the duty as a matter of law to look out for approaching trains and to warn the driver of danger unless there was a visible lack of ordinary care and caution on the part of the driver to keep such a lookout and to avoid such danger.

It should be noted that defendant's Instruction R, though not included in the errors specified by the trial court as grounds for granting plaintiff a new trial, contains the same improper declarations of law as Instructions O, P, Q and S, and was, therefore, erroneous.

It may be well to note also that, in the event of another trial of this case, instructions along this line should not advise the jury that Haley's contributory negligence is a bar to plaintiff's recovery, thereby excluding plaintiff's right of recovery under the humanitarian doctrine. Obviously, instructions of this character were given, at the trial in question, because, by giving defendant's Instruction E, the court excluded plaintiff's right of recovery on that ground from the consideration of the jury.

When considered in connection with plaintiff's Instructions 1 and 2, we do not think defendant's Instruction T was erroneous. This instruction directed a verdict for defendant solely on a finding that the statutory signals were given. Manifestly, it was intended only to meet plaintiff's Instruction 2, which directed a verdict for plaintiff solely on a finding that the statutory signals were not given. In submitting his case on common-law negligence, plaintiff, in his Instruction 1, predicated his recovery on a double finding of the dangerous speed of the train and the failure to give timely warning of its approach: It is apparent, therefore, that a finding in favor of defendant on either one of these issues would defeat plaintiff's recovery on common-law negligence. And, for that reason, defendant's Instruction T did not conflict with plaintiff's Instruction 1, and cannot be properly condemned on that ground.

III.   What has been said concerning proper instructions in this case necessarily disposes of appellant's contention that its general demurrer to the evidence should have been sustained.

The trial court properly held that defendant's Instructions E, O, P, Q and S were erroneous. And its order, in sustaining plaintiff's motion for a new trial because of the errors in such instructions, is accordingly affirmed, and the cause remanded. *Higbee* and *Davis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.