DANIEL J. SMITH, Appellant, v. KANSAS CITY PUBLIC SERVICE COMPANY.—43 S. W. (2d) 548.

Court en Banc, November 17, 1931.

O. H. *Swearingen* and *Fred J. Wolfson* for appellant.

*Powell C. Groner, Charles L. Carr, E. E. Ball* and *Harding, Murphy & Tucker* for respondent.

ATWOOD, C. J.—This appeal was first heard in Division Number 2 where an opinion was written by Commissioner. COOLEY.. One judge concurring, another voting *dubitante* and the third judge

being absent, the cause was transferred to Court en Banc, where it was heard and the divisional opinion adopted as the opinion of the Court en Banc. It appearing that error alleged in defendant's motion for a new trial, but not presented in Division and therefore not dealt with in the opinion, was presented at this hearing en Banc, respondent's motion for rehearing was sustained and after this rehearing the case came to the writer on reassignment. We have carefully considered the divisional opinion in the light of the whole record and all pertinent objections urged by respondent. Finding no fault with its treatment of the matters reached, we adopt all except the concluding paragraph of this opinion, and set forth the adopted portion as follows, without enclosing same in quotation marks.

This is an appeal by plaintiff from an order of the Circuit Court of Jackson County, sustaining defendants' motion for a new trial in an action for personal injuries wherein plaintiff recovered a verdict for $10,000.

The suit was originally brought against Francis M. Wilson and Fred W. Fleming, Receivers of the Kansas City Railways Company. Before the trial, by stipulation of all parties, the present defendant, which had acquired the street railway property and assumed the liabilities of the original defendants, was substituted for the original defendants and entered its appearance and the cause proceeded against it as the defendant. At the time of plaintiff's injury the street railway system of Kansas City was operated by the receivers, but since no point is made regarding the substitution of the present defendant, respondent, and its responsibility for the acts of the receivers, we shall herein for convenience of reference treat it as having been in control at all times involved.

Plaintiff's petition presents a case based upon the humanitarian doctrine and his case was submitted to the jury upon that theory alone. The sufficiency of the petition is not questioned. At the close of plaintiff's evidence and again at the close of all the evidence, defendant requested a peremptory instruction directing a verdict in its favor, which the court refused. But after the verdict for plaintiff the court sustained defendant's motion for new trial upon the ground stated in the record that "the court erred in failing and refusing to give a peremptory instruction in favor of the defendant at the close of the plaintiff's testimony and again at the close of all the evidence." (The sufficiency of the evidence is the only question presented by this appeal.)

Plaintiff was injured at the intersection of Summit Street and West Penn Way in Kansas City, Missouri, by being thrown from a motorcycle on which he was riding when it and defendant's street car collided, the rear wheels of the street car passing over and severing plaintiff's right leg above the knee.

From a plat offered in evidence, the accuracy of which is conceded, it appears that Summit Street runs north and south, is sixty feet wide from property line to property line, the paved portion being thirty-six feet wide, and approximately in the center thereof there are two street car tracks. The west track was used at the time in question by southbound cars. The distance from the east rail of that track to the east property line of Summit Street is 35.8 feet. West Penn Way is an east-and-west street. East of Summit Street it is 109.55 feet wide from property line to property line, the central portion to a width of fifty feet being paved. West of Summit Street there is a "jog." From that point West Penn Way runs northwest, and a narrower street called Twenty-first Street continues westward. The curb at the northeast corner of the Summit-West Penn Way intersection, as stated by appellant, "is rounded to take care of this condition, which tends to pull traffic northwesterly at that point."

At the southwest corner of the intersection above mentioned, on the west side of Summit Street and fronting east thereon, there was located the Ogilvie drug store, the north line of which was fifty feet south of the center of the roadway of West Penn Way, east of Summit. On the west side of Summit Street just north of the northwesterly extension of West Penn Way there was a "car stop" at which point southbound street cars were expected and accustomed to stop. This car stop was about seventy or seventy-five feet north of the north curb line (extended) of West Penn Way east of Summit. (Note: As we are concerned with the situation upon and east of the west car track we shall hereafter, when we speak of West Penn Way, have reference to that street east of Summit Street, unless otherwise indicated.)

Plaintiff's evidence tends to show that about eight o'clock P. M., on February 27, 1926, he was riding his motorcycle westward on West Penn Way about eight or nine feet from the north curb. The motorcycle had a sidecar or "basket" attached to it on its right side. Plaintiff had been traveling about twenty-five miles an hour, and as he approached Summit Street he looked to the north and saw a street car coming southward, the one that later struck him, which was at that time north of the car stop at which he knew it should and expected it would stop, and believing there was no danger from it he looked to the south and saw an automobile coming north in Summit Street south of West Penn Way. Not knowing whether the automobile would come on north or turn west he "slowed down" and put his motorcycle in second speed until he saw that the automobile was turning west, whereupon he again looked to the north and discovered the street car bearing down on him. He testified:

"Well, just as I was giving it the gas to go on, to give it enough speed to shift into third, I looked to the right and when I did that street car was bearing down on me. So I took and turned to the left and stepped on my brake to avoid it. Well, I can't tell you just the distance I went, but I turned to the left going south and when that street car hit me my motorcycle was pointed more south, you would say southwest by the compass. Well, it seemed like it just pushed me. I hung onto the handle bars to stand up. I can't say how long that lasted but the next thing I knew it seemed like I was going backwards and it seemed like I made a regular turn and when I felt that it felt like I fell sitting down and I no more than bumped until I kept sliding, it seemed like my head, shoulders and arms was up in the air, I couldn't feel nothing, I was numb, and the next thing I knew the street car left me, just like I could see the back end of the street car leaving me."

He further testified that when he so discovered the street car he was not quite to the east street car track, but "I knew by the distance I couldn't stop before I hit that street car track, the way that street car was coming, so I stepped on my brakes and at the same time I turned to the left;" that the "left front corner" of the street car struck the motorcycle. "Q. What part of your motorcycle did it strike? A. Well, I couldn't say, but then it seemed like it tipped me over this way (illustrating). It brought the motorcycle itself up in the air. I was kind of on an angle."

On cross-examination he said he had slowed down to about eight miles an hour while watching the automobile, but was going faster than that at the moment he saw the street car bearing down on him; that he could have turned to the south and avoided the collision if the street car had stopped. "Q. The whole thing happened very quickly, almost like that (snapping fingers)? A. Well, not exactly, because I had time to wait for that Ford, or car, it was a small one, and then I had time to shift gears and then look over there and see the car the second time." (The first time he saw the street car was when it was north of the car stop, as above stated.) He could not tell just how far he was from the track when he was going eight miles an hour, nor the speed he was making at the moment he discovered the car the second time as it was bearing down on him, but said: "I was east of the east track, I know." "Q. Could you tell the jury in car-lengths how far that car traveled from the time it struck you until the time it ran over your leg? A. Yes, sir. I went over there at the corner where it happened. Q. How far? A. Just about a car and a half or two cars. Q. You have been over the ground since then? A. Yes, sir, and looked it over."

Louis Rogers, a witness for plaintiff, saw the collision from the front of the Ogilvie drug store. He testified: "Well, he was com-

ing up, going west, and the street car was coming south and it seemed like he tried to go south when the street car fender hit the motorcycle and I coudn't see no more of him. As near as I can recollect now it seemed like the motorcycle was fastened on the trucks of the car . . . It seemed to me when it struck it turned it right around again the car." He further testified that the car did not reduce its speed "until it got down past the drug store. . . ." when it slowed down and stopped; that in his judgment it ran about two car-lengths after it passed over plaintiff's leg; that just before the collision he noticed the motorman and that the motorman appeared to be looking to the west—had his head turned that way; that at that time the front vestibule of the street car was "about the far side (north side), pretty near the far side of Penn Way, just in a manner before it struck him."

Mrs. McRoy, a witness for plaintiff, was a passenger on the street car, sitting on the east side and near the front end of the car. She saw plaintiff "on the north side of the street (West Penn Way) going west," when the street car was "just starting across Penn Way." She indicated on the plat the spot where the street car then was as being approximately even with the north property line of West Penn Way and plaintiff's then position as being somewhat east of the east property line of Summit Street and north of the center of West Penn Way. She said the front part of the car struck the motorcycle.

Witness Girard, for plaintiff, testified that he was a passenger on the street car, sitting in the second or third seat from the front on the east side, and saw plaintiff coming from the east on West Penn Way, "just over the center to the north." He first saw the headlight of plaintiff's motorcycle. "Q. Where was he at that time? A. Oh, it took about four seconds before the collision occurred. I saw him four seconds before the collision occurred." The street car did not slacken its speed from the time witness first saw the headlight until the collision. When it finally stopped the rear end of the car was below (south) the Ogilvie drug store.

John L. Kabler was the motorman on the street car in question at the time of the accident. His deposition had been taken and was offered by plaintiff. He said that he was at his post in the front vestibule of the car and on the alert and had his car under control; that he first saw plaintiff "come from out from behind the traffic a short distance from my car;" the traffic referred to was some automobiles which had stopped and were "on the east side of Summit," waiting for the street car to pass; that the street car was then running ten or twelve miles an hour; that the front end of the car was then "better than half-way across Penn Way;" that he immediately threw on the air brakes and stopped as quickly as pos-

sible; thought he sounded the gong (but no one heard the gong). He said: "And when the front end of my car was past the middle of Penn Way this motorcycle came out around some automobile traffic a short distance from my car and swayed to the south; and as soon as I seen him come out I throwed on the brakes to stop it. Before I could get stopped he hit the car and was under the back trucks; they run over his leg." He testified that at the moment of collision the speed of the street car had been reduced to about eight miles an hour; that the motorcycle struck the street car about midway (from end to end) of the latter; that he stopped the car within about a car-length or about forty-five or fifty feet; that the motorcycle was traveling at a good rate of speed, but he couldn't say how many miles an hour; that the air and the brakes were in good condition, "the car was in good condition all the way through;" that the track was dry and "what we would consider O. K.," and the intersection practically level.

Witness Reed, an experienced motorman, familiar with that type of street car, testified that under the conditions shown by the evidence the car going ten miles an hour, in his judgment, could have been stopped with the appliances at hand and with safety to those on board "with the air brake in ten feet and by reversing you ought to stop it almost instantly;" and that at twelve miles an hour "it would take a little longer, twelve or fourteen feet possibly."

Relative to stopping by use of the brakes, he said: "Q. How long does it take a motorman in the regular discharge of his duties operating a car to place his hand on the air brake, release the air and the air to travel to the brakes, in seconds, about how many seconds? A. He has already got his hand on the air brake, or should have at least, and on his controller at all times, and it is almost instantly. The air is very quick naturally." He said further that in making an emergency stop "or about to have an accident you throw your air over onto emergency and it is almost instantly that the air goes to your brake cylinder;" that it might require possibly a second for the motorman to get the air to the wheels.

After being run over plaintiff did not move until after people had gathered about him and the street car had stopped. The position of both at that time was testified to. While the testimony varied somewhat there was evidence that the rear end of the car when it stopped was a car-length or more south of the spot where plaintiff lay (the car was shown to be about forty-one or forty-four feet long) and that plaintiff's body was at least as far south as the north line of the Ogilvie drug store. One witness placed it "just east of the store entrance, perhaps a little north;" another said: "possibly a

little north of the center of the drug store; . . . a little south of the north line of the drug store.''

The street intersection was a busy one at which there was usually considerable east-and-west traffic. It was shown to be practically level and was lighted. The rails of the car track was dry. It was agreed that the car, running at ten miles an hour would run 14⅔ feet per second; at twelve miles an hour, 17.6 feet per second; at eight miles an hour, 11.7 feet per second, and at six miles an hour 8.9 feet per second.

Witness Bottom, an employee of defendant and its witness, testified that he was in the front vestibule of the car with the motorman, but riding as a passenger; that the sidecar or basket of plaintiff's motorcycle collided with the street car about midway of the length of the latter, throwing plaintiff off backwards ''right in front of the rear trucks;'' that the brakes were applied immediately; that the street car was approximately at the center of West Penn Way at the time of the collision; that witness saw the motorcycle and realized there was going to be an accident when it was fifty or sixty feet from the car, ''coming at a pretty good rate of speed.'' He did not testify that the motorman began trying to stop prior to the actual collision.

Another witness for defendant, a passenger who sat on the west side of the car, saw the motorcycle when it was fifty or seventy-five feet from the car. He said the motorcycle was traveling about thirty-five miles an hour, coming straight ahead, did not change its course of speed, struck the car about midway of its length and ''just right instantly'' after the collision the car passed over plaintiff's leg. He further testified that the motorman ''started stopping'' instantly after the collision.

Defendant's conductor and witness, Foreman, was in the rear end of the car and did not see the motorcycle, but ''almost past the center'' of Penn Way he heard a crash on the east side of the car and immediately after that heard the brakes go on. From his cross-examination it appears that he meant that the front end of the car was almost past the center of West Penn Way when he heard the crash of the collision. The whole examination on that point was as follows:

Direct examination: ''Q. While you were crossing Penn Way did anything strike your car? A. Well, almost past the center I heard a crash on the east side of the car.'' Cross-examination: ''Q. Why do you say almost past the center? Do you mean not quite past the center? A. Well, to my memory I think we passed the center. Q. How far past the center when the crash occurred? A. It couldn't have been but a few feet, four or five feet, if any. Q. You are trying to place that from your position in the rear of

the car, you are trying to tell the jury within four or five feet of where the front end of your car was when this crash occurred, is that it? A. I can come pretty nigh to it, yes, sir.''

He was not further questioned on that point. He estimated the speed of the car prior to the application of the brakes at six or seven miles an hour and testified that it ran "maybe four or five feet" after he heard the crash before he heard the brakes go on, and stopped in forty feet.

Plaintiff's witness Rogers also estimated the speed of the street car at six, seven or eight miles an hour.

Defendant's witness Williams saw the accident. He testified that the motorcycle ran against the car. He couldn't tell whether the motorcycle itself or the right wheel of the sidecar struck the street car. He said in answer to a question that the street car had gotten a little over half way across the street (West Penn Way) when the motorcycle struck it, but when asked to mark on the plat the point of collision he marked a ·point north of the center and nearer the north curb line (extended) than the center line of the street. When he made that mark he said: ''That is where he hit the car with the motorcycle, but the front part of the street car is on down Summit further.'' His testimony, as we understand it, puts the point of collision north of the center of West Penn Way.

Other evidence offered by defendant tended to show that the street car, going at the rate of speed and under the conditions shown, could have been stopped with safety in thirty-eight to forty-five feet, the estimates varying between those distances; that plaintiff's motorcycle struck the car about midway of its side and that the car was stopped within its length after the collision. No witness testified to hearing or feeling the brakes go on or to any slackening of the speed of the car before the collision occurred, except the motorman whose testimony on that point has been noted above. It was not shown that there were any scratches or marks of collision on the side of the car.

We are of the opinion that plaintiff made a submissible case under the humanitarian rule, and that the court properly overruled defendant's demurrers to the evidence and submitted the case to the jury. Since defendant did not stand upon its demurrer at the close of plaintiff's case in chief but offered evidence, the question of submissibility is to be determined by consideration of all the evidence, and it is well established that in determining this question plaintiff is entitled to have the evidence most favorable to him taken by the court as true and is entitled to such favorable inference as may reasonably be drawn therefrom. So considered there is evidence from which the jury could find that the motorman discovered or should have discovered plaintiff in or coming into a position

of peril and oblivious thereto in time, by the exercise of proper care, to have stopped the car before running over him. The evidence on the part of both plaintiff and defendant tends to show that as plaintiff emerged from behind the traffic on the east side of Summit Street and started to cross that street he was apparently oblivious of the approach of the street car from the north. His own testimony was that he was then watching the automobile coming from the south on Summit Street. Witnesses for defendant testified that he came straight ahead as though intending to cross the tracks. The motorman's testimony shows that he realized as soon as he saw plaintiff emerge from behind the traffic that plaintff was in or coming into danger and oblivious thereto, because he says that he at once applied his air brakes and had somewhat reduced his speed before the collision occurred. The jury may have believed that he saw and appreciated plaintiff's peril, but did not act as promptly as he says he did. The fact that the motorman was plaintiff's witness does not make all that he testified to conclusive upon plaintiff. The facts may be shown to be otherwise by other evidence. See Maginnis v. Mo. Pac. Ry. Co., 268 Mo. 667, 187 S. W. 1165, and cases cited. We think the evidence authorized a finding that plaintiff was in or coming into a position of danger and oblivious thereto from the time he entered upon Summit Street and that the motorman's duty to act arose at once when he saw or should have seen plaintiff emerge from behind the traffic. [See Maginnis v. Ry. Co., supra; Smith v. St. Louis-S. F. Ry. Co., 9 S. W. (2d) 939, 945, 321 Mo. 105; Larkin v. Wells, 278 S. W. 1087, and cases cited; State ex rel. v. Trimble et al. (Mo.), 260 S. W. 1000, and cases cited.] There was evidence from which the jury could find that the street car was then just entering West Penn Way, fifty feet or so north of the center of that street, and that plaintiff's approach was observed by persons on the street car, among them one who was in the vestibule with the motorman, when the motorcycle was fifty to seventy-five feet from the street car—one witness said four seconds before the collision. If others on the car could see plaintiff, the motorman could have seen him. It was his duty to be on the lookout as he had no right to expect a clear track at that intersection. Where one is charged with the duty to look and to look is to see, he must be held to have seen what looking would have revealed. [Schroeder v. Wells, 310 Mo. 642, 276 S. W. 60, and cases cited.] The instructions given at defendant's request recognized this principle and required the jury, in order to return a verdict for plaintiff, to find that plaintiff was in or coming into a place of danger, that he was oblivious thereto and that the motorman saw or by the exercise of ordinary care could have seen plaintiff in such danger and oblivious thereof in time, by the exercise of ordinary care, to have avoided the injury. The applicability of the principle in this case is thus conceded. The motor-

cycle, as it entered Summit Street, was moving no faster than, if as fast as, the car. All the evidence shows that the car could have been stopped at least within its length. Reed's testimony indicates that it could have been stopped in less space if going twelve miles an hour, and there was evidence from both sides that it was not going that fast, therefore could have been stopped in a shorter distance. If then, the street car was just entering West Penn Way when the motorman discovered or should have discovered plaintiff thus coming into a position of peril and if the brakes had been applied promptly the car could have been stopped before (according to plaintiff's evidence) it ran over plaintiff's leg—perhaps even without an actual collision. There is evidence that the point of collision was about the center or slightly north of the center of West Penn Way, something like fifty feet south of where the car was when some of the passengers first observed plaintiff's approach. Plaintiff, when he discovered the street car, turned southward to avoid it. He testified that had it stopped he could have avoided it. Doubtless if its speed had been substantially reduced by an earlier application of the brakes, he might have avoided the collision. Moreover, it must be borne in mind that plaintiff testified he was carried along for about one and a half car-lengths after the collision before he finally fell under the wheels, and other evidence shows that when he was run over he was as far south as the Ogilvie drug store, fifty feet or more south of where some of the evidence places the point of collision.

There was evidence that the fender of the street car struck the motorcycle; that the motorcycle, when plaintiff fell off, was "on an angle;" and that the motorcycle seemed to be caught in some way on the trucks of the car. There were no marks of collision on the side of the car. It is not an unreasonable inference that the fender or the trucks of the car in some way caught the sidecar or basket of the motorcycle, which was next the street car when the motorcycle swerved southward, and carried it along for a distance before plaintiff fell off and under the wheels. That is the effect of plaintiff's evidence and there is nothing inherently impossible in it. Its weight was for the jury.

Other evidence both for plaintiff and defendant shows that the street car brakes were neither heard nor felt, nor was there any slackening of the speed of the car until after the collision, and there was evidence that the car ran more than its length after the wheels passed over plaintiff's leg. The jury may well have found that no effort was made by the motorman to stop the car until the collision occurred and that if such effort had been made when, according to the evidence favorable to plaintiff, it should have been made, the injury to plaintiff would have been avoided.

Respondent contends that no negligence on its part was shown and cites cases holding that those operating a train or street car or such instrumentality have a right to assume that a person approaching the track and aware of the approach of a train or car will stop before getting into a position of peril and are not bound to take steps to avert a possible collision until such person appears to be in danger and unconscious thereof. Without taking time and space to analyze the cases cited, it is enough to say that we recognize the rule, but for reasons above shown do not consider it applicable in this case. As shown above, there was evidence from which the jury could find that plaintiff was or should have been seen in or coming into a position of peril and apparently oblivious thereof, in time for defendant, by the exercise of the care incumbent upon it, to avert the injury. See Logan v. C. B. & Q. Ry. Co., 300 Mo. 611, 629, 254 S. W. 705, quoting from Ellis v. Met. St. Ry. Co., 234 Mo. 657, 671, 138 S. W. 23.

Much stress is laid also by respondent on plaintiff's alleged contributory negligence. Contributory negligence is not pleaded, defendant alleging in its answer that it was guilty of no negligence and that plaintiff's injury was caused solely by his own negligence. But since plaintiff's case rests wholly upon the humanitarian doctrine it is unnecessary to determine whether or not plaintiff's evidence so conclusively shows contributory negligence on his part as to bar recovery if his case rested upon primary negligence of defendant. Contributory negligence does not bar recovery under the humanitarian rule. The principles governing the application of that rule in cases where the injured party had himself been guilty of negligence in getting into a position of peril have so often been discussed and applied by this and other appellate courts of the State that further discussion is unnecessary. Among others, the following cases applying the rule may be consulted: Schroeder v. Wells, supra; Logan v. C. B. & Q. Railroad Co., supra; Smith v. St. Louis-S. F. Ry. Co., supra; Bode v. Wells (Mo.), 15 S. W. (2d) 335; Burke v. Pappas (Mo.), 293 S. W. 142, 145; Vowels v. Mo. Pac. Ry. Co. (Mo.), 8 S. W. (2d) 7; Dutcher v. Wabash Railroad Co., 241 Mo. 137, 145 S. W. 63; Conley v. C. R. I. & P. Ry. Co. (Mo. App.), 284 S. W. 180; Eppstein v. Mo. Pac. Ry. Co., 197 Mo. 720, 732 et seq., 94 S. W. 967.

It is suggested in respondent's brief that the trial court is given a wide discretion in passing upon motions for new trial. If by that suggestion it is meant to imply that the court had the right to grant a new trial for reasons other than those stated in the motion for new trial, it cannot apply in this case because the ruling complained of was made at the term of court succeeding that at which the verdict was returned and when the court

could not set aside the verdict and grant a new trial except upon grounds stated in the motion. [Gray v. Missouri Lumber Co. (Mo.), 177 S. W. 595.] And the court's order shows that it was not attempting to exercise a discretionary power, but was determining a legal question, viz., that conceding the truth of all the evidence favorable to plaintiff the facts were not legally sufficient to authorize a verdict for plaintiff. This, it seems to us, is a question of law rather than of judicial discretion. On appeal from an order sustaining a motion for new trial, where the grounds upon which the trial court sustained it are stated in the order as required by statute and as was done here, appellant has the burden of showing that the grounds stated do not justify the order. But such order specifying the grounds therefor is treated in effect as overruling the motion as to other grounds set forth in the motion and if respondent seeks to uphold the trial court's ruling on other grounds than those upon which the court sustained the motion he must point out such other grounds and show that the ruling should be sustained therefor, notwithstanding the grounds stated by the court do not justify the ruling. See Yuronis v. Wells (Mo.), 17 S. W. (2d) 518, and cases cited. Respondent's brief is devoted to an effort to show that plaintiff did not make a submissible case and that therefore the court's ruling was right on the ground stated. There is a suggestion by respondent that the allegation of its motion that the verdict is against the weight of the evidence is *included* in the reason stated by the court that the demurrer to the evidence should have been sustained. We think not. Sustaining a demurrer means that there is no substantial evidence to authorize a verdict. Setting aside a verdict because against the *weight* of the evidence necessarily concedes that there is some substantial evidence which entitled plaintiff to go to the jury. See Keller v. St. Louis Butchers' Supply Co. (Mo.), 229 S. W. 173. Setting aside a verdict because against the weight of the evidence is peculiarly within the discretion and province of the trial court. [Smoot v. Kansas City, 194 Mo. 513, 531, 92 S. W. 363.] But in this case the trial court, as shown by its order, did not exercise that discretion in defendant's favor. In sustaining the motion for new trial on the ground specified it ruled that no case had been made for the jury and in so ruling we think the court erred. See Davis v. Hill Bros. Veneer Co. (Mo. App.), 20 S. W. (2d) 928.

Having adopted the foregoing from the divisional opinion as a part of this opinion we will now proceed to consider other alleged errors set forth in defendant's motion for a new trial and presented for the first time, as respondent had a right to do (Sutton v. Anderson (Mo.), 31 S. W. (2d) 1026, 1030), at the hearing after transfer of the cause to Court en Banc.

The first error thus assigned is directed to the giving of plaintiff's requested instruction numbered 4, as modified by the court, which is as follows:

"The court instructs the jury that the defendant in this case set up as a defense to the action that plaintiff ran into the street car and was the sole cause of his own injuries.

"The court instructs you that the burden is on the defendants to prove to your satisfaction by the greater weight or preponderance of the evidence that the plaintiff did run into the street car operated by defendants and caused his own injuries and unless the defendants prove to your satisfaction by the greater weight or preponderance of the evidence that the plaintiff did run into the street car, and 'was the sole cause of his own injuries,' then you will find for the plaintiff and against the defendants. on that issue."

It is urged that notwithstanding defendant abandoned its answer first filed, which was solely a general denial, and thereafter filed an amended answer upon which the case was submitted consisting of a general denial followed by specific denials, pleading of certain ordinances, and further allegations that "the street car mentioned in plaintiff's petition was proceeding southward in harmony with the ordinances and rules and regulations of the city; that the operators thereof were guilty of no negligence of whatsoever kind or character; that the plaintiff approached the intersection of Twenty-first Street on West Penn Way and Summit Street in a careless and negligent way and collided with the east side of said street car and that his injuries, if any, were caused solely and exclusively by his own negligence, and that the conduct of the operators of said car was in no wise negligent and in no wise contributed to the injury of plaintiff, if any," yet this defense might well have been interposed under a general denial, and that the above instruction (a) improperly assumed that defendant's answer was an affirmative defense, (b) improperly placed the burden of proof on defendant, (c) narrowed the issues and ignored the defense to the humanitarian doctrine, and (d) was antagonistic to the pleadings and other instructions given on the last-chance doctrine.

We have already alluded to the fact that contributory negligence on the part of plaintiff was not pleaded. The plea in the amended answer that plaintiff's "injuries, if any, were caused solely and exclusively by his own negligence" was not a plea of contributory negligence or any other sort of affirmative defense. It was merely a denial of plaintiff's cause of action. [45 C. J. 1119, sec. 697; p. 1123, sec. 703; Miller v. Engle, 185 Mo. App. 558, 580, 172 S. W. 631; Benjamin v. Railroad, 245 Mo. 598, 614, 151 S. W. 91.] As for the allegation of plaintiff's careless approach and collision with the street car, in Bolton v. Ry. Co.. 172 Mo. 92, 102, 72 S. W. 530,

we said: "Any fact the effect of which is to show that an essential statement in the plaintiff's cause of action is untrue may be proven under the general denial, and, therefore, should not be specially pleaded and if so pleaded should be stricken out as redundant." In Griffith v. Continental Casualty Co., 290 Mo. 455, 235 S. W. 83, the answer admitted execution of the policy and the death of the insured, but denied the other allegations of the petition and further averred that the death of Griffith was due to suicide and self-destruction. At the instance of plaintiff the court gave an instruction which, among other things, advised the jury that "the burden was upon defendant to prove by a preponderance of the evidence that said Harry C. Griffith intentionally threw himself from the window with the intent and purpose of killing himself." We held that the averment in defendant's answer that Griffith's death "was due to suicide and self-destruction" was equivalent merely to a denial that the insured's death was caused through "accidental means by accidentally falling out of the window" as alleged in plaintiff's petition; that it did not tender an affirmative defense in any sense; that the issue would have been just the same had the answer been merely a general denial; that the burden of proving accidental death still rested upon plaintiff; that there was no burden upon defendant to show in what manner or by what means the insured came to his death; and that it was error to give this instruction. By the same course of reasoning it seems clear that it was error to give above instruction numbered 4 in the instant case.

Counsel for appellant say that it was not error to give this instruction because defendant's answer "set up a special defense which it had the burden of proving." What we have said in the preceding paragraph refutes this contention.

They also quote Instruction E given at defendant's request, and say: "Plaintiff's Instruction 4 simply adopted defendant's theory of the case, and if there is any error in such instruction it was invited error." Of course, on appeal the parties will be held to the same theory they adopted in the trial court, but in this case the evidence tending to prove that plaintiff's injuries were caused solely by his own negligence was offered under what, as above indicated, was in effect a general denial. It was simply one way of showing that defendant was not negligent, but the burden of proving that defendant was negligent as charged was still on plaintiff, and there is nothing to indicate that it was ever defendant's theory of the case that it had the burden of proving the negative. The impropriety, heretofore suggested, of such an averment in the answer was simply a matter of pleading (State ex rel. v. Trimble, 302 Mo. 699, 712, 258 S. W. 1013; Ramp v. Ry. Co., 133 Mo. App. 700, 704, 114 S. W. 59), of which plaintiff may not now complain. Defendant's above mentioned Instruction E is as follows:

"The court instructs the jury that if you find and believe from the evidence that plaintiff's injuries are the result of his sole negligence without any negligence on the part of the motorman in charge of said street car, then your verdict must be for the defendant."

This instruction might well have been asked under a general denial. It does not change the burden of proof and did not invite the error into which plaintiff fell.

It is also urged in behalf of appellant that plaintiff's instruction numbered 4 did not direct a verdict for the plaintiff and any error therein was cured by other instructions. Other instructions were given at defendant's request calling for a verdict for defendant unless plaintiff had shown to the reasonable satisfaction of the jury by the preponderance or greater weight of the evidence that the defendant was guilty of negligence as otherwise instructed, but there was no instruction given relieving defendant of the burden of proof erroneously imposed by plaintiff's Instruction 4. The net result was conflict and confusion in the instructions given constituting reversible error.

Respondent finally insists that the court should have granted a new trial because of error in permitting two persons to serve as jurors over the objections of defendant directed to their qualifications as disclosed on the *voir dire* examination. One said that he had a claim against a railroad on account of the death of his son and his son's wife, but that a satisfactory settlement was reached out of court and he could hear this case without any feeling of sympathy that might influence his verdict. The other juror said that he had formerly ridden a motorcycle and had several accidents, but nothing in this experience would prejudice him either for or against plaintiff or defendant in this case. In Parlon v. Wells, 322 Mo. 1001, 17 S. W. (2d) 528, we have recently reviewed the authorities defining the discretion of the trial court in determining the qualification of jurors. After a careful study of the record pertinent hereto we are satisfied that the court did not err in qualifying these jurors.

However, because of error in giving plaintiff's modified instruction numbered 4 a new trial should be had. The judgment of the trial court granting a new trial is, therefore, affirmed and the cause remanded. All concur.