Hattie Molkenbur (Plaintiff), Respondent, v. St. Louis Public Service Co., a Corporation (Defendant), Appellant.—103 S. W. (2d) 560.

St. Louis Court of Appeals. Opinion filed April 6, 1937.

Motion for rehearing overruled April 20, 1937.

*Alfred L. Grattendick* for respondent.

*T. E. Francis* and *S. G. Nipper* for appellant.

HOSTETTER, P. J.—This suit is one for damages for personal injuries alleged to have been sustained by plaintiff on the 25th day of February, 1931, caused by a collision between a street car owned and operated by defendant and an automobile in which plaintiff was a back seat passenger.

Plaintiff's suit was instituted in the circuit court of the city of St. Louis on May 16, 1931, and was tried in said court to a jury, which resulted in a verdict in her favor returned on November 23, 1934, for $4000, on which judgment was rendered, and, after an

unavailing motion for a new trial, the defendant brings the cause to this court by appeal for review.

Plaintiff's case was submitted to the jury on the charge of violation on the part of the motorman of the humanitarian rule, also of his negligent failure to keep a vigilant watch under the then existing circumstances, and his negligent failure to sound a signal of warning.

The answer was a general denial and a plea of contributory negligence in failure on the part of plaintiff to warn the driver of the automobile of the danger of the collision.

Defendant's first assignment of error is that the court should have given its instruction in the nature of a demurrer to the evidence offered at the close of all the testimony.

The facts are substantially as follows:

The collision occurred in the city of St. Louis at the intersection of Tower Grove and Chouteau Avenues, the former being a north south street and the latter an east and west street. Tower Grove Avenue is thirty-six feet wide from curb to curb and Chouteau Avenue is fifty feet and three inches wide from curb to curb in that vicinity.

The Ford coach was, at the time of the collision, being driven northwardly on Tower Grove Avenue by Mrs. Alma Hess, a cousin of the plaintiff. The other occupants of the auto were Mrs. Hess' sister, Mrs. Edna Fitzgerald, and her two children, one of whom was in the front seat with Mrs. Hess at the time of the collision, and plaintiff and her child and Mrs. Fitzgerald and her other child were in the back seat.

The street car, which collided with the auto, was traveling east on Chouteau Avenue.

Mrs. Hess, the driver of the auto, testified that they were returning from a visit made in south St. Louis, and, having reached Tower Grove Avenue she proceeded north thereon, driving along slowly; that when she reached Chouteau Avenue she stopped for the boulevard stop sign, and saw the east bound street car approaching the corner and also saw people standing in the street on the southwest corner as if they intended boarding the car; that when she started into the intersection the street car was coming very fast, but had not then reached the corner and that she saw it again as she was crossing the east bound street car tracks, being astride the tracks when the left side of her auto was struck in the middle by the street car, which pushed her auto east on Chouteau Avenue and when it stopped, the left side of her auto was about even with the east curb of Tower Grove Avenue; that some gentleman came up and took the passengers out and she got out badly shaken up and noticed that Mrs. Molkenbur (plaintiff) had fainted.

Edna Fitzgerald gave testimony substantially the same as that

given by Mrs. Hess. She further testified that when the auto made the boulevard stop the street car was almost its own length west of the west line of Tower Grove Avenue; that she was sitting on the right side and plaintiff on the left side of the rear seat, each with a child in her lap and that her three year old child was in the front seat with the driver; that she knew the boulevard stop was made, because she observed a design of fruit in a grocery store on the east side of Tower Grove Avenue and remarked to plaintiff how pretty it was; that she saw people standing out in Chouteau Avenue and just west of the west line of Tower Grove Avenue as if waiting to board the east bound street car; that she had driven cars herself; that the auto when it made the boulevard stop was about the width of one machine from its right side to the east curb of Tower Grove Avenue, and as it started up to go into the intersection she saw the street car about a street car's length from the corner, coming pretty fast and she then looked east and then looked back and it was then right upon them ''and then he excitedly clanged his bell—it looked like he couldn't stop;'' and that they were right straddle of the tracks; that the auto was in second speed and had reached a speed of eight or ten miles an hour by the time it got astraddle of the street car tracks; that going at the rate of ten miles an hour the Ford car could have been safely stopped in two or three feet, with safety to its occupants.

Plaintiff was unable to give any testimony as to the circumstances which brought about the collision, it appearing that she had fainted as a result of the collision.

Other testimony offered on behalf of plaintiff was to the effect that a street car traveling twenty miles an hour at the time and place in question could have been safely stopped in fifty feet.

Stanley Meek, a witness called by plaintiff, testified that he was driving a car following Mrs. Hess' car, going north on Tower Grove Avenue; that she was driving at a speed of twenty miles an hour; that when he saw Mrs. Hess make the boulevard stop he also saw an eastbound street car on Chouteau Avenue about a half block away from the intersection; that the speed of the street car was about twenty miles an hour when he first saw it; that after making the boulevard stop Mrs. Hess proceeded to go on across; that when her front wheels reached the south rail of the east bound car track the street car was about ten feet from her; that when the street car struck the auto the latter was about five feet east of the center line of Tower Grove Avenue, and was dragged about ten feet and landed so that the lefthand side of the auto was even with the east curb of Tower Grove Avenue; that after Mrs. Hess made the boulevard stop and started to go ahead, her speed was about eight miles per hour; that he was about seven feet behind her following across; that he saw a man and a boy standing out in the street

at the southwest corner as if waiting to board the street car; that the first time he noticed an effort to stop the street car was when it was about ten feet away from the auto when the motorman threw on the brakes; that he heard no warning from the street car until they were right there; that he was six or seven feet behind Mrs. Hess following her across; that the streets were dry and it was a clear day and the sun was still shining; that the stop sign was about four feet back, or south, of the building line; that by building line he meant the north edge of the buildings which face on Chouteau; that he stopped about eight feet behind Mrs. Hess' car, with the front of his car about eighteen feet south of the building line; that Mrs. Hess' car was about five feet east of the center line of Tower Grove Avenue; that after Mrs. Hess' started up and he following, the next time he saw the street car it had traveled to about five feet west of the center line of Tower Grove Avenue, when it first clanged, and when the collision occurred the Ford car was right square across the street car tracks and the street car pushed it along until it was even with the curb line of Tower Grove Avenue; that he did not hear the brakes applied on the street car until it was about five feet west of the center line of Tower Grove Avenue; that when he heard the clang and the brakes applied the street car had the same speed of twenty miles an hour.

Leslie A. Briggs, the motorman on the street car, testified on behalf of defendant substantially as follows: That he was going east on Chouteau Avenue on the regular run and that as the street car approached the intersection of Chouteau and Tower Grove Avenues he slowed down from the regular speed of about fifteen miles an hour to five or six miles per hour; that the south curb of Chouteau on the west side of Tower Grove Avenue was a regular street car stop for the reception and discharge of passengers; that nobody on the street car gave any signal of a desire to get off and that he saw no one standing out in the street where prospective passengers stand, and that there was no requirement for him to stop on account of passengers either to get off or get on the street car at the intersection; that he slowed up the street car because that was a dangerous intersection; that when the street car was approaching the west curb of Tower Grove Avenue that he looked to the south and then to the north and to the south again and first saw the automobile about fifty or sixty feet away, coming north on Tower Grove Avenue about the center of the street; that he had speeded up the street car at the time he first saw the automobile, and then saw it was not going to stop and he began to try to stop; that the automobile made no stop before entering Chouteau Avenue nor did it slacken its speed; that the street car was about ten feet past the curb line when he first realized that the automobile was not going to stop and the street car had picked up its speed to about eight

miles per hour and that he slammed on his brakes and that the automobile stopped on the street car tracks about five or six feet in front of his street car, that the street car then contacted the automobile and stopped about ten feet west of the east curb line of Tower Grove Avenue; that he saw no automobile going north on Tower Grove Avenue other than the one he collided with; that he stopped the street car as quick as he possibly could, considering the safety of the passengers; that the automobile was within twenty feet south of the south street car track when he first applied the brake and was going about twenty or twenty-five miles an hour at that time and hadn't slowed up at all; that the auto was traveling about five feet east of the center line of Tower Grove Avenue and did not swerve; that when the collision occurred the front wheels of the auto were on the north rail and the rear wheels were on the south rail of the east bound street car tracks; that the street car hit the auto right in the center; that, after the impact, the auto was pushed along three or four feet; that the collision did no damage to the street car; that before the collision he heard no horn nor any noise from the auto; that he didn't see the driver of the auto at all until after the accident.

Defendant called four witnesses, all of whom testified that they were passengers on the street car at the time of the collision, but the testimony adduced by them was of slight value being confusing and unilluminative and, in part, at variance with, and contradictory to the testimony of each other and to testimony adduced on behalf of plaintiff as well as testimony adduced on behalf of defendant.

Morris Cooper, the first passenger witness of the four called by defendant, testified under repeated questions, stoutly and stubbornly, with a grim determination to stick to it, that, instead of the street car running into the auto, the auto ran into and hit the street car and broke out its two front windows.

Keeping in mind the approved rule which applies in considering whether an instruction in the nature of a demurrer to the evidence should be given, we think that it is quite apparent that the trial court ruled properly when it refused to give defendant's requested instruction.

Under such approved rule we are required to take plaintiff's evidence as true and to disregard defendant's evidence which conflicts with plaintiff's evidence and give plaintiff the benefit of all reasonable and legitimate inferences arising from all the evidence and also the benefit of all the testimony given by defendant which tends to support plaintiff's case and to all reasonable inferences deducible from facts and circumstances tending to support plaintiff's theory of the case. [Jordan v. St. Louis Public Service Co., opinion of the St. Louis Court of Appeals by Judge McCullen, not yet reported; Maginnis v. Mo. Pac. Ry. Co., 268 Mo. 667, 187 S. W.

1165; Marshak v. Wm. J. Brennan Grocery Co. (Mo. App.), 83 S. W. (2d) 185, 1. c. 189, and cases there cited; Francis v. Mo. Pac. Transportation Co. (Mo. App.), 85 S. W. (2d) 915, 1. c. 917, and cases there cited; Smith v. Kansas City Pub. Service Co., 328 Mo. 979, 43 S. W. (2d) 548.]

Defendant in its assignment of errors assails the correctness of plaintiff's given instructions, numbers 1 and 2. The former submitted the case to the jury under the humanitarian or last chance doctrine. The latter, after submitting formal and undisputed facts as to the time and place of the accident and the occurrence of the collision, proceeded as follows:

". . . and if you further find and believe that the motorman of said street car carelessly and negligently failed to keep vigilant watch under the circumstances you may find then existed, or that said motorman carelessly and negligently failed to sound a signal warning of the approach of said street car, and that as a direct result of such negligence, if any, the street car was caused and permitted to collide with the said automobile in which plaintiff was a passenger (if you so find) and injure plaintiff, and that at all times referred to plaintiff exercised due care for her own safety, then you should find for the plaintiff."

Paragraphs from an ordinance of the city of St. Louis was offered in evidence on the part of the plaintiff, reading as follows:

"The conductor, motorman, gripman, driver or any other person in charge of each car shall keep vigilant watch for all vehicles and persons on foot, especially children, either on the track or moving towards it, and on the first appearance of danger to such persons or vehicles, the car shall be stopped in the shortest time and space possible. . . . Every person operating a motor vehicle or street railway car on the streets of this city shall operate or drive the same in a careful and prudent manner, and at a rate of speed so as not to endanger the life or limb of any person, or the property of any person."

The driver of an automobile about to cross street car tracks may properly presume that the motorman will make the regular stop for passengers waiting to board the street car. [Harrington v. Dunham, 273 Mo. 414, 202 S. W. 1066.]

We think that under all the testimony, contradictory in many respects as it was, there were sufficient facts, if believed by the jury, to justify the giving of both of the criticised instructions.

The defendant asked and the court gave the following instructions, viz.:

"Instruction No. 3.

"The court instructs you that the motorman of the street car mentioned in the evidence had the right to assume that all vehicles

approaching northwardly on Tower Grove Avenue would stop before entering the intersection of Tower Grove Avenue and Chouteau Avenue and that he was under no duty to stop his street car, or to take any steps whatever to avoid a collision until he saw, or, by the exercise of care, could have seen that such vehicle would not stop in compliance with the traffic regulations. Therefore, in this case, you are instructed that the motorman was under no duty to attempt to stop or slacken the speed of his street car until the automobile, in which plaintiff was riding, had reached a point in or near said intersection when it became apparent to him, in the exercise of care, that said automobile would not stop.

"Instruction No. 4.

"While the negligence of the driver of the automobile mentioned in the evidence is not to be imputed to this plaintiff, nevertheless, if you find and believe from the evidence that the collision was due solely to the negligence of the driver of said automobile and was not due in any manner to the negligence of the motorman as such negligence is defined in other instructions, then your verdict must be in favor of the defendant St. Louis Public Service Company.

"Instruction No. 5.

"You are further instructed that if you find and believe from the evidence that after the motorman saw, or, by the exercise of care, could have seen that the automobile mentioned in the evidence would not stop before entering Chouteau Avenue, it was then too late for said motorman, in the exercise of care and with the means at hand, to have so operated said street car as to avoid the collision, then your verdict must be in favor of the defendant St. Louis Public Service Company.

"Instruction No. 6.

"The court instructs you that the burden is upon the plaintiff in this case to prove by the preponderance, that is, the greater weight of the credible evidence, that the collision directly resulted from the negligence, if any, of the motorman, as such negligence is defined in other instructions given you, and unless you do find that the credible evidence preponderates in favor of the plaintiff in this respect, then your verdict must be for the defendant St. Louis Public Service Company regardless of any other issue, fact or circumstance in the case."

We think that the giving of said instructions on behalf of the defendant fully and fairly presented the case for the proper consideration of the jury, and cured any alleged defects in plaintiff's instructions, of which complaint is made.

The fact that the motorman admitted that the intersection was a dangerous one, and that it was a regular stop for the reception and discharge of passengers, and the further fact that the testimony on behalf of plaintiff was to the effect that there were persons standing in the place on Chouteau Avenue where people usually stand who wish to become passengers on the east bound street cars, would seem to require the exercise of due diligence and watchfulness on the part of the motorman to discover whether any autos coming from the south on Tower Grove Avenue either had entered a zone of imminent danger, or were about so to do.

We concede the law to be, as contended by defendant's counsel, to the effect that defendant cannot be held liable under the humanitarian rule unless its motorman had, or by the exercise of ordinary care could have, become aware of the fact that the auto had been driven into a place of danger from collision or was about to be driven into such place of danger, and thereafter failed to use the proper and legal efforts necessary to avoid the collision. We find, however, that there is sufficient testimony which, if the jury, the triers of the facts, believed to be true justified the giving of such instruction under the humanitarian rule and the rendition of a judgment in favor of the plaintiff thereunder.

Defendant complains of the excessiveness of the verdict and that there is no testimony tending to show that plaintiff sustained a permanent injury.

The defendant offered no testimony in respect to the extent of plaintiff's injuries, neither did it request any instruction in respect to amount of the damages claimed or seeking to limit plaintiff's recovery to damages as for temporary injuries.

There was medical testimony offered on behalf of plaintiff to the effect that she suffered a fracture of the ascending ramus of the ischium, a part of the pelvic bones, the bone that protrudes toward the buttock, the part that bears weight when one sits down; that she also suffered a separation of the ilium or larger flaring part of the pelvic bone where it connects with the spine or sacrum; that he, the examing physician, found that her condition at the time of trial was that she still complained of pain around her shoulder, some thickening to the front of the left shoulder and that she still complained of pain in the region of this fracture, and that he also found tenderness still existing in that region, and that, so far as use of her limb was concerned there was a limp or defect in her walk and an inability to raise her limb sideways and upward, more on the left side than on the right.

The plaintiff testified that she remembered nothing as to the accident or how it happened; that when she regained consciousness she found herself in Barnes Hospital; that she stayed in bed for eight weeks, her physician calling every day; that she had a broken

pelvic bone and a cut below the first two fingers of her right hand; that she was made unable to move for eight weeks; that she has to drag her limb when she walks; that she cannot sit in one position very long at one time; that she feels pain in her left limb and in her spine when she walks; that her limb feels out of place and wet weather causes her to suffer more; that these pains have continued ever since she was injured; that a growth developed on her shoulder six or eight months after the accident; that she is still nervous; that prior to her injury her health was good and she could walk all right and never had such pains as she has suffered since the accident.

The fact that this description of the effects of the injuries was given at the time of the trial, which was over four years after the date of the accident, and the further fact that the attending physician who treated her immediately following the accident, also examined her at the time of the trial and testified that her condition could not be corrected by further treatment, would indicate such a degree of permanency of her injuries as to justify the giving of an instruction leaving it to the jury to determine whether or not she should be allowed damages on the basis of having sustained permanent injuries.

Finding no reversible error in the record, it follows that the judgment of the trial court should be affirmed and it is so ordered. *Becker* and *McCullen, JJ.,* concur.

### ON MOTION FOR REHEARING.

HOSTETTER, J.—The defendant in its motion for a rehearing complains of the excessiveness of the verdict, and particularly stresses the alleged erroneous admission of testimony of Dr. Arthur H. de Masy and asserts that his testimony to the effect that there was a "possibility of plaintiff's alleged injury being of a permanent character" was reversible error, and would not furnish sufficient testimony to justify an instruction leaving it to the jury to determine whether or not the plaintiff was permanently injured and, if so found, to allow damages to her on that basis.

The defendant ignores the fact that there are other statements in the record which would justify leaving it to the jury to determine whether or not her injuries were permanent. The defendant ignores plaintiff's own testimony in regard to the permanency of her injuries and the fact that at the time of the trial, four years later than the date of the accident, she still had pains in the region of the fracture and a limp, or defect in her walk, and an inability to raise her limb sideways and upward, more on the left side than the right. Defendant also overlooks the testimony of Dr. de Masy who, not only treated her at the time of the reception of her injuries, but, examined her four years later, about the time of the trial, and found that she still complained of pain around her shoulder, some thicken-

ing to the front of the left shoulder, some pain in the region of the fracture and he found tenderness still existing in that region and he found a slight defect in her walk and an inability to raise her limb upwards and sideways, more so on the left side than on the right, and found there *would be no possible way of correcting it.*

We set out from the record the question and answer so strongly criticized in defendant's motion for a rehearing.

On redirect examination of Dr. de Masy by plaintiff's counsel, occurs the following:

"Q. From your examination of the injury, doctor, in your opinion would you say she would continue to suffer in the future from the injury sustained? A. Well, this is four years after the time of the injury, and she still complains of pain in that region, and there is also tenderness elicited in that same area, so, four years after date, with that finding, there is a possibility of that continuing to bother her.

"Mr. Grattendick: That is all, doctor.

"Mr. Evans: I object to that, and move the court to strike it out, as not being based on medical opinion, but simply speculation. He says there is a possibility of it continuing.

"The Court: Mr. Grattendick; it seems to me it should be stricken, unless you have the witness amplify further on it.

"Mr. Grattendick: (to reporter) Will you read the question, please? (Whereupon the reporter read from the record the last question above.)

"Mr. Grattendick: What was the answer? (Whereupon the reporter read from the record the answer to the last question above.)

"Mr. Grattendick: I think that answer is all right.

"Mr. Evans: Answers the question, but in a speculative way.

"The Court: I think, taking the answer as a whole, the court will let the answer stand. To which ruling of the court defendant, by counsel, then and there duly objected and excepted and still continues to object and except."

The only ground in defendant's motion for a new trial in respect to the admission of improper testimony reads as follows:

"Because the court erred in admitting irrelevant, incompetent, immaterial and prejudicial testimony offered by plaintiff over and against the objection of defendant."

It will be noted that there was no objection made by defendant to this alleged improper testimony until after the testimony was given and defendant's real complaint was the refusal of the trial court to strike it out. There is no ground set out in the motion for a new trial which complains of the refusal of the trial court to strike out this alleged prejudicial answer.

Defendant's motion for a rehearing is overruled. *Becker* and *McCullen, JJ.,* concur.